No. 59,064

Jack R. Hunt, *Appellant*, v. Grey Dresie; David J. Wood; and Dresie, Jorgensen and Wood, P.A., A Professional Corporation Formed Under the Laws of the State of Kansas, *Appellees*.

(740 P.2d 1046)

Opinion filed July 17, 1987.

*John Terry Moore*, of Moore & Rapp, P.A., of Wichita, argued the cause and was on the brief for appellant.

*Darrell D. Kellogg*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Forrest James Robinson, Jr.*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

McFARLAND, J.: This is a legal malpractice action brought by Jack R. Hunt against Grey Dresie, David J. Wood, and Dresie, Jorgensen and Wood, P.A. The case was resolved by the district court over a period of time by the entry of multiple summary

judgments. Each party has appealed from the summary judgment or summary judgments adverse to him or it. The Court of Appeals affirmed the district court in part, reversed in part, and remanded the case for further proceedings in an unpublished opinion filed February 12, 1987. All parties filed petitions for review which were granted by this court.

The factual background giving rise to this action is extraordinarily complex involving a number of other legal actions spanning a period of many years. An excellent summary of the prior litigation is contained in *Sampson v. Hunt*, 233 Kan. 572, 655 P.2d 743 (1983), hereafter *Sampson*, which will be set forth in this opinion. Before proceeding thereto, however, a brief statement concerning the claims involved in the case before us should render the recitation from *Sampson* more meaningful. *Sampson* was a malicious prosecution action predicated upon the filing of two actions against Sampson (the so called Note and Bank cases). In *Sampson*, the plaintiff was awarded a judgment against Hunt for $20,000 actual damages and $600,000 punitive damages. In the action before us, Hunt claims the defendants: (1) were negligent in filing the Bank and Note cases; (2) were negligent in failing to assert the advice of counsel defense in *Sampson*; and (3) are liable to him for the $620,000 judgment entered against him in *Sampson*.

The factual statement contained in *Sampson* is set forth as follows:

"This lawsuit is the culmination of a long history of business association and litigation between the plaintiff and defendants. In 1960 or 1961 the plaintiff and defendant Hunt became business partners and formed Construction and Development, Inc. (C & D). They were also partners in several other business projects, including Bonanza, Inc., which owned the Sweetbriar Shopping Center in Wichita. In 1970 Hunt and Sampson agreed to separate their joint business interests. Hunt became the sole owner of C & D. Hunt also purchased Sampson's interest in Bonanza, Inc., and the Sweetbriar Shopping Center.

"Prior to this time C & D had entered into a contract with Seneca Square, Inc., to construct an addition to the Seneca Square Shopping Center in Wichita, which was owned by Seneca Square, Inc. Seneca Square, Inc., was wholly owned by Western Land and Development, Inc. (Western). Due to problems encountered during construction, it became necessary for Seneca Square, Inc., to arrange additional financing so the project could be completed. The Fourth National Bank and Trust Company in Wichita was unwilling to advance additional financing unless the indebtedness could be personally guaranteed by financially

responsible people. Frank Malone, a stockholder in Western and Seneca Square, Inc., asked Hunt to approach Sampson about the possibility of these three individuals personally guaranteeing the note for Seneca Square, Inc. Sampson agreed, and in exchange for their participation, Hunt and Sampson each received one-third of Malone's stock in Western. In addition, Malone, Sampson and Hunt entered into an indemnity agreement wherein they each assumed equal liability (one-third) of any indebtedness owed by Seneca Square, Inc. For its work on the project C & D received a promissory note from Seneca Square, Inc., in the amount of $50,000. This note was personally guaranteed by Sampson, Malone and Hunt to enable C & D to pledge it as collateral for other loans.

"In 1971, Sampson, Malone and Seneca Square, Inc., in three separate lawsuits, sued Hunt and C & D for fraud, misrepresentation and breach of fiduciary duty arising out of the financing of the Seneca Square project. C & D filed a counterclaim against the plaintiff for collection of the $50,000 promissory note. These actions were consolidated for trial and eventually resulted in a stalemate, with judgment denied on all claims of the parties. In denying judgment to C & D on the promissory note the trial court ruled:

'The note given to Construction and Development, Inc., by Seneca Square, Inc., for $50,000 is a valid, legal obligation of the plaintiff, Seneca Square, Inc.; endorsements and guarantees of the plaintiffs, Sampson and Malone, were made with consideration; and further, the note in question is covered by the terms of the so-called "Indemnity Agreement" of July, 1970.'

In addition the trial court made the following specific finding of fact:

'The plaintiffs, Sampson and Malone, and the defendant, Hunt, jointly and severally, endorsed and guaranteed payment to the Fourth National Bank and Trust Company, Wichita, Kansas on behalf of Seneca Square, Inc., but the maximum amount that such endorsements and guarantees reached was $2,200,000.00. That at the present time there is still due and payable to the Fourth National Bank a sum of around $15,000.00. That all three of the above-named parties have paid their proportionate share of the amounts of such debts. *The defendant, Hunt, is responsible for the $15,000.00.*' (Emphasis added.)

"During the course of discovery in the Seneca Square case, Sampson learned that Hunt had withheld information and made misrepresentations concerning the financial situation of Bonanza, Inc., when Hunt purchased Sampson's interest in that enterprise. Sampson and other family members who had owned shares of Bonanza, Inc., commenced a second lawsuit against Hunt while the Seneca Square case was pending, alleging fraud and breach of fiduciary duty. Sampson and his family were awarded a judgment against Hunt in the amount of $93,000. This case was appealed by Hunt to the Supreme Court and affirmed in *Sampson v. Hunt*, 222 Kan. 268, 564 P.2d 489 (1977). Sampson ultimately collected approximately $120,000 from Hunt on the judgment and accumulated interest.

"In November 1973, while the Bonanza, Inc., lawsuit was pending, the Fourth National Bank and Trust Company of Wichita filed a lawsuit against Malone, Sampson and Hunt to collect the balance of $15,000 due on a promissory note guaranteed by them in connection with the Seneca Square project. This was the same $15,000 found by the court in the Seneca Square case to be owed by Hunt.

Hunt filed a cross-claim against Sampson and Malone, *as sole owner of C & D, to collect under the indemnity agreement on the $50,000 promissory note* given by Seneca Square, Inc., to C & D. Hunt alleged in his cross-petition that the promissory note was pledged as security for a bank loan with People's State Bank of McPherson which was used in furtherance of the Seneca Square project. Hunt subsequently was required to make payments of over $30,000 in principal and interest on the note. Hunt sought indemnification from Malone and Sampson as personal guarantors on the note, pursuant to the indemnification agreement. C & D was not a party in the Fourth National Bank case. Eventually Hunt paid the balance due on the Fourth National Bank note and *all claims in the case were dismissed with prejudice on March 29, 1974, including Hunt's cross-claim on the $50,000 promissory note.*

"The present action is the result of two lawsuits filed on December 31, 1975. In the first lawsuit, entitled *Construction and Development, Inc. v. Seneca Square, Inc., Frank A. Malone and Sherman H. Sampson,* case No. C35451 (Note Case), C & D sought to *collect on the $50,000 promissory note from the named defendant.* Malone and Sampson were subsequently dismissed from the case on the ground that the claim on the promissory note had previously been filed against them and dismissed with prejudice in the Fourth National Bank case, constituting res judicata. The order of dismissal was appealed by defendant Hunt, but was subsequently dismissed.

"The second lawsuit, *Jack R. Hunt v. Seneca Square, Inc., Western Land & Development, Inc., Frank A. Malone and Sherman H. Sampson,* case No. C35452 (Bank Case), arose out of a dispute over a lease agreement entered into between Seneca Square, Inc., and one of the tenants of the Seneca Square Shopping Center on January 4, 1974. At that time Hunt, Sampson and Malone were stockholders and directors of Western and Seneca Square, Inc. The new lease agreement provided for an advance rental payment of approximately $111,000. This money was used to pay off outstanding notes owed by Seneca Square, Inc., totaling over $100,000. These notes were personally guaranteed by Sampson, Hunt and Malone. Hunt opposed ratification of the new lease agreement because he felt it would be in violation of the mortgage agreement with the first mortgage holder on the shopping center and would trigger a foreclosure on the property, the sole asset of Seneca Square, Inc.

"Due to financial difficulties encountered by Seneca Square, Inc., *a majority of the directors voted in July 1974, not to make the mortgage payment on the property and instead to pay all other outstanding indebtedness owed by Seneca Square, Inc., including obligations personally guaranteed by stockholders of the company.* Subsequently, in August 1974, the mortgage holder instituted foreclosure proceedings against the property. The shopping center property was ultimately assigned to the mortgagee in lieu of foreclosure.

"The defendant Hunt brought the lawsuit against Malone and Sampson, as majority stockholders of Western, alleging fraud and breach of fiduciary duty in executing the new lease agreement, resulting in foreclosure and the loss of his investment in the property in the amount of $111,000. Hunt subsequently repurchased the property for the mortgagee, and in October 1977, almost two

years after the suit was filed, he dismissed the action against Malone and Sampson. Hunt testified he dismissed the action because he felt it was time to 'extend the olive branch' and bring the disputes between him and Sampson to an end.

"The case at bar was instituted by the plaintiff in July 1978, against defendants Hunt and C & D, alleging that defendant Hunt was the alter ego of C & D and that both the Note Case and Bank Case were brought maliciously and without probable cause. The plaintiff sought actual damages in the amount of $10,000 and punitive damages of $1,000,000 for each alleged maliciously prosecuted case. After hearing evidence by both sides the trial court granted directed verdicts in favor of the plaintiff on four issues, ruling as a matter of law: (1) defendant Hunt was the alter ego of defendant Construction and Development, Inc.; (2) defendants Hunt and C & D did not have probable cause to bring the lawsuit in the Note Case; (3) defendant Hunt did not have probable cause to bring the lawsuit in the Bank Case; and (4) both cases terminated in favor of the plaintiff. The jury was instructed accordingly and returned a verdict in favor of the plaintiff in the amount of $10,000 actual and $300,000 punitive damages for each maliciously prosecuted case." 233 Kan. at 574-77.

We affirmed the judgment entered in *Sampson*. Subsequently, Hunt brought this legal malpractice action against the attorneys who represented him in the filing and prosecution of the Note and Bank cases, and in the defense of the *Sampson* case. In a melange of summary judgments, the district court held: (1) defendant attorneys lacked probable cause to file the Note and Bank cases and were negligent therein as a matter of law; (2) defendant attorneys were not negligent as a matter of law in failing to assert the advice of counsel defense in *Sampson* and any deficiency of performance was, at most, an "error of judgment"; and (3) Hunt could not recover any of the $620,000 judgment awarded in *Sampson* from the attorneys herein as such judgment was the result of Hunt's malicious conduct. The Court of Appeals affirmed the district court on its holding number (1), and reversed the district court on its holdings in numbers (2) and (3). As previously stated, the case is before us on petitions for review filed by all parties. Additional facts will be stated where necessary to the discussion of particular issues.

At this point, the general rules relative to summary judgments should be stated. Summary judgment is proper if no genuine issue of fact remains, giving the benefit of all inferences which may be drawn from the admitted facts to the party against whom judgment is sought. A trial court, in ruling on motions for sum-

mary judgment, should search the record to determine whether issues of material fact do exist. When a motion for summary judgment is filed, a mere surmise or belief by the trial court, no matter how reasonably entertained, that a party cannot prevail upon a trial will not justify refusing that party his day in court. When summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. *Barnhart v. McKinney*, 235 Kan. 511, Syl. ¶¶ 1, 2, 682 P.2d 112 (1984); *McAlister v. Atlantic Richfield Co.*, 233 Kan. 252, Syl. ¶¶ 1, 2, 3, 4, 662 P.2d 1203 (1983); *Ebert v. Mussett*, 214 Kan. 62, 65, 519 P.2d 687 (1974); *Lawrence v. Deemy*, 204 Kan. 299, 301-02, 461 P.2d 770 (1969).

Before addressing the specific issues, it is also appropriate to state the elements of the tort of malicious prosecution and the defense thereto known as advice of counsel. In *Sampson v. Hunt*, 233 Kan. at 582, we held, quoting *Nelson v. Miller*, 227 Kan. 271, 607 P.2d 438 (1980), that a plaintiff must prove the following facts to recover in an action based upon malicious prosecution of a civil action:

" '(a) That the defendant initiated, continued, or procured civil procedures against the plaintiff.

" '(b) That the defendant in so doing acted without probable cause.

" '(c) That the defendant acted with malice, that is he acted primarily for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based.

" '(d) That the proceeding terminated in favor of plaintiff.

" '(e) That the plaintiff sustained damages.'

. . .

'Probable cause for instituting a proceeding exists when there is a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent man in the belief that the party committed the act of which he is complaining. [Citations omitted.] In cases of malicious prosecution, the inquiry as to want of probable cause is limited to the facts and circumstances as they appeared to defendant at the time the prosecution was commenced. [Citations omitted.] If the facts are undisputed, the question of probable cause is one for the court to decide as a matter of law. [Citations omitted.] If the facts tending to establish the existence or want of existence of probable cause are in dispute, it becomes the duty of the trial court to submit the question to the jury.' "

In the absence of probable cause, courts permit but do not

direct juries to infer malice. *Nelson v. Miller*, 227 Kan. at 279. The plaintiff's attorney in the original action may also be held liable for malicious prosecution. 227 Kan. at 276.

In 52 Am. Jur. 2d, Malicious Prosecution § 174, the defense is explained as follows:

"A defendant . . . who claims protection because he acted on the advice of others, must show, in order to establish his defense, that he did not seek to procure an opinion in order to shelter himself, but acted in good faith, believing that he had good cause for his action; that he made a full and honest disclosure of all the material facts within his knowledge or belief; that he was himself doubtful of his legal rights, and had reason to presume that the person whose advice he sought or followed was learned in the law and of such training and experience that he might safely be presumed to be competent to give wise and prudent counsel in important matters and to act under a sense of responsibility; and that he honestly pursued the directions of his adviser."

See 52 Am. Jur. 2d, Malicious Prosecution §§ 77, 78, 83, 84, 86, 87.

Since a party has probable cause for suit when he reasonably believes he has a proper complaint, he may rely on the advice of counsel to provide him with a reasonable belief. *Nelson v. Miller*, 227 Kan. at 279-80. To establish the defense, he must prove he disclosed all facts he knew and all he could have learned with diligent effort, and then he must have acted on the attorney's advice in good faith. 227 Kan. at 279.

We turn now to the issues.

## NEGLIGENCE IN THE FILING OF THE NOTE AND BANK CASES

The district court held that defendant attorneys lacked probable cause to file the Note and Bank cases and were negligent as a matter of law in so doing. The Court of Appeals affirmed this determination.

In affirming the trial court's findings of lack of probable cause in *Sampson* for the filing of the Note and Bank cases, we said:

"Hunt, as sole owner of C & D, was in complete privity with C & D when he asserted its right to payment of the $50,000 note from Malone and Sampson in the Fourth National Bank case. This same claim was asserted by C & D in the Note Case. Under the circumstances presented here the appellants had no reasonable ground to believe a legitimate cause of action existed on behalf of C & D for payment of the $50,000 note at the time the Note Case was filed. The dismissal of the claim with prejudice in the Fourth National Bank case was res judicata and barred a subsequent action by C & D against Malone and Sampson for payment

on the note. The trial court properly ruled as a matter of law the appellants did not have probable cause to bring the action in the Note Case." 233 Kan. at 583.

and:

"[N]o evidence appeared in the record from which it could reasonably be concluded that Hunt had probable cause to bring an action against Sampson and others for breach of fiduciary duty owed Western's minority stockholders. Hunt testified he participated in the negotiations with the tenant for the new lease. He was aware at all times that negotiations were underway for a new lease; however, he testified he did not participate in the ultimate lease agreement and did not ratify the new lease. He was not aware a new lease had been signed by the stockholders until some time after it was signed. At a meeting of the stockholders in April 1974, a majority of the directors ratified the lease over Hunt's objections. The money from the advance rental payment under the new lease was used to eliminate two notes owed by Seneca Square, Inc., upon which Hunt, Sampson and Malone were guarantors. In July 1974, a meeting of the board of directors was called, and a majority of the board voted to pay off obligations of Seneca Square, Inc., which were personally guaranteed by stockholders, including Hunt and Sampson, rather than pay the mortgagee. This was again done over Hunt's objection. At this time Seneca Square, Inc., was in serious financial straits and foreclosure was imminent. Hunt and Sampson benefited equally from the elimination of the obligations of Seneca Square, Inc. All directors of the corporation lost their investment in, and ownership of, the property.

"Hunt's action for breach of fiduciary duty is founded solely upon actions taken by the board of directors over his objections. While Hunt was not aware of the actual lease agreement being entered into, he was, by his own admission, aware at all time that negotiations for a new lease were underway and actively participated in those negotiations. The actions of which Hunt complains, the new lease agreement and decision to pay off outstanding obligations of the corporation rather than the mortgagee, *were management decisions of the board of directors and did not work to perpetrate a fraud on any stockholder.* No unfair transactions were undertaken which resulted in unjust enrichment for Sampson or any other director. It appears from the record the board of directors was attempting a good faith effort to make what little they could out of a bad situation. They did what they thought was best for the good of the corporation and the stockholders involved. The trial court did not err in granting a directed verdict on this issue." 233 Kan. at 585-86.

Wood contends he did not know about the dismissal of the Fourth National Bank case although his partner Dresie handled that matter for Hunt. Wood, apparently, never reviewed the numerous lawsuits involving Hunt and Sampson and the corporations involved in their business dealings to ascertain how such litigation related to the Note and Bank claims. Rather, the lawsuits were filed solely upon Hunt's representations. In *Nelson v. Miller*, we stated:

"We further reject the statement in *Maechtlen [v. Clapp*, 121 Kan. 777, 250 Pac. 303 (1926),] that an attorney may act on the assumption that the facts related by his client are honestly given and are substantially correct and that it is not his duty to go elsewhere for information respecting the honesty of the claim or the good faith of his client." 227 Kan. at 284.

We further stated:

"In most cases, the clients of attorneys are not knowledgeable in the law, nor do they know how or where further information about the case may be acquired. It is obvious that the client must rely upon his lawyer to make a reasonable investigation of his case. Likewise, the attorney must accept the obligation to conduct a reasonable investigation in an attempt to find what the true facts are before filing a civil action on behalf of his client." 227 Kan. at 284.

Where an attorney has reason to believe personal animosity exists between his client and the proposed defendant, he should carefully investigate the facts and satisfy himself that the client is not attempting to use his services merely as an instrument of vengeance. One of the services an attorney provides his client is learned objectivity in evaluating claims and counselling on the course of action to be taken.

The difficulty herein lies in the fact that the finding of negligence was made in a motion for summary judgment. Had the finding been made following a bench trial, we would be in an entirely different situation on appellate review. Whether or not defendants were negligent in filing the suits depends upon the totality of the circumstances as determined by the trier of facts. Because district judges and appellate court judges are, themselves, attorneys, they naturally have opinions as to whether or not certain conduct constitutes legal malpractice. It is easy to slip into the trap of deciding such questions "as a matter of law." Not having a like expertise in other professions such as medicine or architecture, the issues of professional negligence there are routinely submitted to juries. Nevertheless, claims of legal malpractice, like other forms of malpractice, are normally to be determined by the trier of fact rather than by summary judgment. We conclude that both the district court and the Court of Appeals erred in holding that defendant attorneys were negligent as a matter of law in filing the Note and Bank cases.

## NEGLIGENCE IN THE FAILURE TO ASSERT
## THE ADVICE OF COUNSEL DEFENSE

In his deposition testimony, Wood testified he did not assert the advice of counsel defense in *Sampson* because he did not believe it "would work." A co-counsel in *Sampson* twice suggested the defense to Wood, but the suggestion was summarily brushed away. Wood is in an unenviable position in defending the claims of negligence herein. In defending on the claims relative to the filing of the Note and Bank cases, he characterized Hunt as a businessman, a longtime client, and an individual upon whom he, in essence, could rely to give him all relevant facts without Wood having the duty to make an independent investigation. Yet the heart of his defense to the claim concerning his failure to assert the advice of counsel defense is that Hunt had been proven to be such a malicious and vindictive person that the jury would not have believed the advice of counsel defense and that the same could not have affected the verdict in *Sampson*. It is undisputed that the defendant attorneys never discussed this defense with Hunt. In *Sampson*, evidence was introduced that Hunt had threatened retaliation against Sampson after the latter won the Bonanza, Inc., case and that he could file lawsuits and otherwise "get even."

The district court held that, as a matter of law, the failure to assert the defense did not constitute legal malpractice and, at most, it was an error in judgment that did not affect the outcome of the case. This rationale is hard to follow. A flood of evidence establishing malice by Hunt toward Sampson had come into the *Sampson* trial. With an advice of counsel defense, the jury might have found Hunt, notwithstanding his personal malice toward Sampson, had probable cause to file the Note and Bank cases. It is difficult to see how the assertions of the defense could have harmed Hunt.

The Court of Appeals in discussing the "error of judgment" concept stated in its opinion herein:

" 'An attorney not guilty of misconduct or fraud will be protected, when he acts to the best of his skill and knowledge, and of course is not answerable for every error or mistake. He is legally responsible to his client only for the want of ordinary care and ordinary skill; but he must conduct himself with honor and integrity.' *Haverty v. Haverty*, 35 Kan. 438, 444-45, 11 Pac. 364 (1886).
In that case, the court ordered a new trial in a divorce case because the husband's

attorney had accepted $100.00 from the wife's attorney in lieu of raising any defense for the absent husband. 35 Kan. at 445-47. We have found no further Kansas cases which discuss the error of judgment concept.

"In one legal malpractice treatise, the authors point out a problem with the concept. 'Notwithstanding centuries of applying the error of judgment rule in attorney malpractice actions, the courts have not analyzed or defined the judgmental process being protected.' Mallen and Levit, Legal Malpractice § 211, p. 299 (2d ed. 1981).

"Mallen and Levit propose the following analysis of errors of judgment:

" 'Nevertheless, a client is entitled to the benefit of an *informed* judgment. When the issue is one that is settled and can be identified through ordinary research and investigation techniques, an attorney should not be able to avoid liability by claiming the error was one of judgment. On the other hand, when the proposition is one on which reasonable lawyers could disagree or which involves a choice of strategy, an error of informed judgment should not be gauged by hindsight or second-guessed by an expert witness. [Emphasis in original.]' Mallen and Levit, Legal Malpractice § 215, p. 311."

The Court of Appeals then held the failure to assert the advice of counsel defense to be legal malpractice as a matter of law.

The advice of counsel defense is rather unique. If asserted in *Sampson*, it would have had the effect of Wood saying to the jury that if there were fault in the filing of the Note and Bank cases, then the fault was that of Wood rather than Hunt. Had it been asserted, then defendant attorneys would have been disqualified from further representation in the case as they would have become witnesses. By asserting this defense into the case, Wood could have opened up a question of his own liability to the plaintiff in *Sampson* and exposed himself to litigation by Hunt. Generally, outside independent counsel should be consulted on whether or not the defense should be asserted under such circumstances, and the client should be involved in the decision therein.

We conclude that whether or not the defendants' failure to assert an advice of counsel defense in *Sampson* constitutes legal malpractice should be submitted to the trier of fact herein for determination. The trier of fact can determine if there was a breach of a duty owed the client and, if so, what effect, if any, said breach had on the verdict.

### ADVICE OF COUNSEL AS A COMPLETE OR PARTIAL DEFENSE

The Court of Appeals analyzed this issue as follows:

"This defense [advice of counsel] itself asks the jury to decide whether Hunt was entitled to rely completely on his attorneys to determine probable cause to file

the suits and thus supersedes the attorneys' negligence in filing the suits as a possible proximate cause of Hunt's damages.

"We believe the PIK Civil 2d instruction on the defense of advice of a prosecuting attorney provides a good starting point in considering the defense. PIK Civ. 2d 14.33. That instruction reads:

" 'The advice of a prosecuting attorney as to the institution of a criminal proceeding sought and acted upon in good faith, is a complete defense for malicious prosecution, but this is only so when all of the facts known to the defendant have been fully and truthfully given to such official.'

"In the notes on use of the instruction, the PIK Committee states that this instruction 'should not be used in those instances where the defendant in defense claims reliance upon the advice of private counsel, since such reliance is only evidence of belief of probable cause and not a complete defense.' PIK 2d Civil 14.33, Notes on Use.

"The rule that advice of private counsel is not a complete defense does seem to follow from the distinction between a prosecuting attorney and private counsel: at least generally speaking, the prosecuting attorney alone is responsible for deciding whether criminal charges should be filed while a private attorney has no such authority or discretion. Therefore, the prosecuting attorney's responsibility completely supersedes that of the complainant in the ordinary case. On the other hand, especially when we shift from criminal to civil proceedings, the client retains final authority for the filing of the suit. Consequently, something more is required before the client may shift all responsibility for filing without probable cause to his attorney.

"We believe Hunt must show the following elements for the defense to succeed:

"1. He believed he had good cause for his suits and did not seek his attorneys' advice to shelter himself;

2. he made a full and honest disclosure of all the material facts within his knowledge or belief;

3. he was uncertain of his legal rights;

4. he had reason to believe his attorneys were capable of giving competent advice about the cases; and

5. he honestly pursued their advice.

52 Am. Jur. 2d, Malicious Prosecution § 174.

"The PIK instruction on probable cause reads:

'Probable cause for instituting a (civil) proceeding exists when there are reasonable grounds for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent man to believe that the party committed the act of which complaint is made. In determining the issue of probable cause, you should consider only the facts and circumstances that were apparent to the defendant in this action at the time the original proceeding was instituted.' PIK Civ. 2d 14.31.

The elements of the defense, then, seem largely directed to the question of the fact and reasonableness of Hunt's belief he had valid legal claims against Sampson. The jury should be asked to consider such things as whether Hunt

relied on his attorneys to decide he had valid claims or did not care what they thought, and whether a person with his knowledge and experience should reasonably have believed the claims to be valid without regard to his attorneys' views.

. . . .

"As indicated by Mallen and Levit, to recover for his attorneys' negligence, a client must show:

'1. the duty of the professional to exercise ordinary skill and knowledge;

2. a breach of that duty;

3. the causal connection between the negligent conduct and the resulting injury; and

4. actual loss or damage.' Mallen and Levit, Legal Malpractice § 654, p. 804 (2d ed. 1981).

"In such cases, 'the client must prove that the omitted defense was legally meritorious, factually provable and would have produced a better result.' Mallen and Levit, Legal Malpractice § 564, p. 702. This, in effect, requires a re-creation of the original trial but with the defense asserted. As Mallen and Levit note, this means the judge and jury must enter 'a virtual fantasy world of hypothetical questions of fact and law and of assumed plaintiffs and defendants facing academic claims of liability and using evidence which is not quite what it seems.' Mallen and Levit, Legal Malpractice § 650, pp. 796-97.

"In this case, then, we believe a . . . trial is required and the jury must be asked to decide what effect, if any, the assertion of the defense would have had on the original jury's verdict. it should be free to decide that the defense would have had no effect, it would have been a complete defense, or anything between the two."

We believe this rationale of the Court of Appeals is sound and adequately disposes of this issue.

## WHETHER HUNT IS BARRED FROM RECOVERY AGAINST THE DEFENDANTS

The district court held that Hunt was barred from recovering any damages against the defendants. The Court of Appeals reversed this determination upon the following rationale:

"In its first decision, the trial court concluded Hunt's malicious conduct toward Sampson barred his recovery of the punitive damages assessed against him in *Sampson*. The court began its discussion with an incorrect statement: 'Should Hunt succeed in this attempt to gain indemnity for punitive damages, the result would be the same as though Sampson had sought and recovered those damages in *Sampson* from [the defendants]. That would have required proof of malice on the part of these defendants.' While the second statement alone is true, Hunt's recovery in this case would not accomplish the same result. Hunt would recover for the attorneys' breach of a duty owed to him, not for malice toward Sampson. An example may clarify this distinction: if a crash victim sues an attorney's client for injuries the client inflicted by negligent driving and the

attorney negligently defends his client, resulting in the client's liability, the client may recover those damages from the attorney, if at all, not because the attorney had anything to do with the wreck, but because the attorney's negligence caused the loss of the lawsuit.

"The trial court cited two cases which discuss the propriety of assessing punitive damages in certain situations, see *Iola State Bank v. Bolan*, 235 Kan. 175, Syl. ¶ 9, 679 P.2d 720 (1984); *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 64-65, 643 P.2d 100 (1982), but rested its conclusion Hunt could not recover the punitive damages on *Bowman v. Doherty*, 235 Kan. 870, 881-82, 686 P.2d 112 (1984). Under *Bowman*, the trial court noted, one defendant's negligence cannot be used to offset any part of the punitive damages assessed against another defendant for his wanton conduct. In its final decision, the court expanded this reasoning to conclude Hunt's intentional misconduct barred him from recovering either the punitive or actual damages assessed against him in *Sampson*. The court discussed cases holding intentional conduct may not be compared with negligence under our comparative fault statute, K.S.A. 60-258a, see, *e.g.*, *M. Bruenger & Co. v. Dodge City Truck Stop, Inc.*, 234 Kan. 682, 687, 675 P.2d 864 (1984); *Sieben v. Sieben*, 231 Kan. 372, 378, 646 P.2d 1036 (1982), and cited 18 Am. Jur. 2d, Contribution § 41, p. 49 and 41 Am. Jur. 2d, Indemnity § 21, p. 710 for the proposition that contribution and indemnity are not available to intentional joint tortfeasors. It further noted, 'Except where there is a common judgment against joint tortfeasors in Kansas (or where comparative negligence applies) any tortfeasor may be held for the total damages. If paid by one, he cannot look to any others.'

"The trial court has failed to see a crucial distinction between the cases and authorities it cited and Hunt's suit against his former attorneys. The damages Hunt had to pay under the *Sampson* judgment included damages called punitive damages from the vantage point of that lawsuit. From the vantage point of *this* lawsuit, should Hunt be successful, all the damages are simply those which proximately resulted from his attorneys' negligence; they are no longer properly called punitive damages. If they were called punitive damages and the trial court's decision properly denied their recovery, then any attorney representing a client who might be assessed punitive damages in a lawsuit could rest easy, secure in the knowledge that any improper handling of the suit, even intentional actions, could not subject the attorney to any malpractice liability at all."

We believe the Court of Appeals reached the correct result on this issue. If an attorney is hired to represent a man sued for having committed an intentional tort and then fails to raise a valid statute of limitations defense with the result being a judgment for actual and punitive damages against the client, the failure to raise the defense is the entire cause of his damage. But for the legal malpractice, the client would have had no judgment against him. The statute of limitations defense is a complete defense—so the subsequent legal malpractice action would be

an all or nothing proposition. The advice of counsel defense has been determined to be not necessarily a complete defense. A jury could find the defense, if asserted, would have reduced or eliminated the punitive or the actual damages awarded, but it should be free to consider the entire judgment as being Hunt's damages.

Defendants' next issue involves certain constitutional issues raised for the first time before this court. We have often held that where constitutional grounds for reversal are asserted for the first time on appeal, they are not properly before the appellate court for review. *Murphy v. IBP, Inc.*, 240 Kan. 141, Syl. ¶ 3, 727 P.2d 468 (1986); *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 374, 552 P.2d 885 (1976) (quoting *State v. Estes*, 216 Kan. 382, Syl. ¶ 3, 532 P.2d 1283 [1975]); *Kansas State Board of Healing Arts v. Seasholtz*, 210 Kan. 694, 698, 504 P.2d 576 (1972).

The judgment of the district court is reversed, the judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings.

LOCKETT, J., not participating.