Merle HABERER, Florence Haberer, and Haberer Dairy and Farm Equipment, Inc., and Carney Haberer, Plaintiffs and Appellants,

v.

George J. RICE, Defendant and Appellee.

No. 17947.

Supreme Court of South Dakota.

Considered on Briefs on Jan. 11, 1993.

Decided Jan. 26, 1994.

Rick Johnson of Johnson, Eklund & Abourezk, Gregory, for plaintiffs and appellants.

Rory King of Siegel, Barnett & Schutz, Aberdeen, for defendant and appellee.

McMURCHIE, Circuit Judge.

This appeal is one of a continuing saga: *Haberer v. First Bank of South Dakota,* 429 N.W.2d 62 (S.D.1988) and *Haberer v. Rice,* 476 N.W.2d 276 (S.D.1991).

In *Haberer v. First Bank, supra,* this Court held that when the bank had earlier sued Haberer to foreclose on a note executed by Haberer and the bank, Haberer's action against the bank for allegedly breaching an agreement to lend Haberer $150,000 was a compulsory counterclaim to the bank's original action and could not be separately pur-sued. Summary judgment for the bank was affirmed because Haberer failed to raise his compulsory counterclaim in the prior action.

In *Haberer v. Rice, supra,* the issues were tried before the court without a jury and we held that Haberers were entitled to a jury trial on their legal malpractice claims.

On remand for the jury trial, the trial court directed a verdict for Rice, as to First Bank's liability in the underlying cause of action. The trial court held that Haberers, in the counterclaim, failed to introduce competent evidence that they suffered any damages proximately caused by First Bank. The trial court also directed a verdict for Rice on the primary cause of action, holding that Haberers failed to introduce competent evidence that they suffered any damages proximately caused by Rice's alleged negligence and that the business would have been successful.

### BACKGROUND

From the evidence Haberer's version of the facts are:

Merle and Florence Haberer operated a hardware and ·dairy equipment business in Bowdle, South Dakota. Merle got involved with reconditioning and reselling used milk tanks. Over the years he developed a washing system for tanks for which he received a U.S. patent. Ultimately, Merle sought to open his own plant for manufacturing milk bulk tanks. This was going to be a family venture consisting of Merle and Florence, their three sons and a son-in-law.

Merle found a large building owned by John Evelo that he could purchase in Aberdeen (Evelo building). He could acquire the building without any down payment and would only have to take over the Small Business Administration (SBA) loan on it. Haberer was able to put his equipment in the building while he arranged financing.

In early February 1983 Haberer began negotiating with First Bank of Aberdeen (First Bank) to obtain financing for establishing the manufacturing plant. He had set his estimated needs at $250,000. First Bank suggested he apply for an SBA loan. Haberer consulted some local Certified Public Ac-

countants who helped him prepare income and expense projections for the business. These projections and the SBA application were submitted to First Bank on or about February 11, 1983. First Bank rejected the loan in-house and the application was not submitted to SBA.

In the meantime, Haberer borrowed $100,-000 against his interest in the family farm through Bob DeVaan, John Evelo's realtor. Haberer then attended an equipment auction in Kansas City and was able to purchase nearly all of the major equipment needed to start the plant for less than $50,000. Since he did not need the entire loan amount, he applied $40,000 to a loan at Sunrise Branch of First Bank in Aberdeen.

First Bank later told Haberer they would not go along with the $250,000 SBA loan. Haberer alleges that First Bank said they would be willing to loan $150,000 to get the plant going if Haberer would sell some other property and reduce his existing indebtedness to the bank. He did as he was told.

Haberer returned to First Bank ready to finalize the $150,000 loan. In order to complete the loan, First Bank further requested that Haberer obtain other guarantors or co-signers on the note. Haberer was able to get a friend, Ed Van Meter of Gypsum, Kansas, to pledge approximately $45,000 in certificates of deposit to secure the loan if he could have the Kansas dealership for Haberer's milk tanks.

On May 9, 1983, Haberer and Van Meter met with First Bank. At this meeting Haberer claims that First Bank committed to loan him $150,000 at thirteen percent for a seven year period. First Bank told Haberer that once the paperwork came back from Kansas, he could have his money. Haberer and Van Meter then went to attorney George Rice's office and related this. Rice wrote a letter to Van Meter summarizing his guaranty (the CDs) and referring to First Bank's $150,000 loan commitment.

After the May 9 meeting, First Bank attached the lender's application to Haberer's February 1983 SBA loan application. Haberers were not aware that this was being done. SBA received this on May 16, 1983.

On the front of this application was a certification by First Bank that they were not willing to give Haberer the loan despite the earlier commitment. SBA denied this application.

Relying upon the loan, Haberer prepared the plant to get it running:

1. He finalized buying the Evelo building for $190,000 with $2,150 monthly payments, first payment due on July 15, 1983.

2. On May 23, 1983, he borrowed $5,000 from Sunrise Branch to pay the electricity deposit for 440 volt power hookups.

3. He and Florence moved from their Bowdle home to the Evelo building.

4. He and his family began to remodel the Evelo building. They hired electricians, plumbers and sales people.

Around the end of May, Haberer went to First Bank on a number of occasions to get the money. He was told the paperwork was not done. He was consistently told that the paperwork was not completed. Rice told Haberer that these things take time. Finally First Bank authorized Haberer to go to the Sunrise Branch of First Bank and get an advance of $20,920.02.

By the end of July, Haberer was in default on the Evelo building payments. The plumbers and electricians left the job.

On July 22, 1983, Rice explained that First Bank had not done the paperwork for the Van Meter guarantees, so he prepared the documents and sent it to Van Meter in Kansas. On or about August 10, 1983, Van Meter sent the signed $150,000 guarantee along with the CDs to First Bank.

On August 11, 1983, First Bank informed Haberer that it was not going to loan the $150,000 at thirteen percent for a long term. The bank told Haberer that it would loan $125,000 at fourteen percent, for a term of 111 days. Rice advised Haberer that he had no other choice except to take First Bank's offer. Rice never advised Haberer of any other options.

First Bank held the funds for distribution purposes. Without telling Haberer, the bank

also paid off the $20,920.02 Sunrise Branch loan and interest from the $125,000 loan proceeds.

Haberers further allege an additional loan agreement from First Bank in November of 1983.

The $125,000 note was due on December 1, 1983. By now, Haberer was in default with all of the creditors and in serious default on the Evelo building payments. First Bank made demand for payment of its loan which Haberer was unable to comply with despite attempts to seek refinancing. Merle Haberer's dream of producing stainless steel milk tanks had become a nightmare.

On May 7, 1984, First Bank served a packet of papers on the Haberers and their guarantor, Van Meter. Haberer delivered these papers to Rice who told him he would take care of it. Rice further told Haberer that he would not have to appear at the May 14, 1984 order to show cause hearing. Rice notified Van Meter's attorney that he would also represent them at this hearing. Rice did not submit any answering affidavits. He did not receive a complaint until the day of the hearing and then never discussed it with any of the plaintiffs. The trial court ordered that First Bank had the right to liquidate the CDs and apply the amount to the Haberers' debt. It further ordered that Haberers were restrained from removing any personal property from the Evelo building.

In early June 1984, Haberers allege that Rice called them to quickly come to his office. Bob DeVaan and Melvin Lehr were there wanting to buy the balance of his Bowdle property. The Haberers went to Rice's office and met with the parties who offered $20,000. The Haberers counter-offered with an alleged agreement resulting on $30,000 for the property.

Haberers allege that Rice advised them to give the deed to the Bowdle property upon Lehr and his realtor's oral representation that payment would be forthcoming. The Haberers refused. At the insistence of Rice they finally relented. They signed the prepared deed and delivered it in the office that day. An unsigned written realtor's closing statement was made containing the $20,000

offer. No other written memorandum of the sale was made. No payment was forthcoming. Haberers have never received any payment for this transaction. Haberers talked to Rice about suing to collect, but nothing ever came of it.

On June 19, 1984, Rice executed a stipulation on behalf of Haberers with First Bank. He did this without their knowledge or authorization. At no time did Rice discuss the terms of the stipulation with them. The stipulation bound the Haberers to give First Bank everything that they owned and bound them not to pursue any defenses or claims against First Bank in the event they did not pay completely by July 2, 1984.

On July 19, 1984, First Bank received a default judgment against Haberers and Van Meter for $141,555.33. The court ruled First Bank was entitled to immediate possession of all Haberer Dairy properties listed in the security agreement and to dispose of the property. Rice did not appear at the hearing even though he promised Haberer he would take care of it. He did not send a copy of the judgment to the Haberers or notify them of it.

The July 19, 1984 default judgment foreclosed the Haberers of their right, title and interest in and to any of the manufacturing plant property or improvements. It also foreclosed Merle Haberer's interest in the real property he was acquiring from Evelo and took all of his patent and manufacturing rights. The judgment did not provide for any equitable adjustment of Haberers' rights for improvements to the real property.

On September 16, 1984, the bank's counsel prepared a bill of sale conveying to First Bank the property it received by virtue of the default judgment. First Bank's counsel asked Rice to get the Haberers to sign the bill of sale to transfer ownership to First Bank. On September 24, 1984 Haberer refused to sign the document until Rice agreed to hold it in escrow for delivery only upon Haberer's authorization. Contrary to that promise, Rice delivered the bill of sale that same day to First Bank's counsel. An auction was ultimately held on August 1, 1985. *See First Bank v. Haberer Dairy & Farm Equipment,* 412 N.W.2d 866 (S.D.1987).

Haberer alleges that there exists a confidential relationship between himself and First Bank because of the nature of the business. The existence or non existence of the confidential relationship between First Bank and the Haberers was never determined by the trial court in the underlying cause of action.

Haberers raise three issues on appeal:

I. Did the trial court err in holding that punitive damages were not recoverable from First Bank in the underlying cause of action?

II. Should the Haberers have been permitted to try the claim for Rice's alleged negligent representation on the land transaction with Melvin Lehr and Bob DeVaan?

III. Did the Haberers introduce sufficient evidence to create a jury issue on the question of damages?

## STANDARD OF REVIEW

■■■ This case is before us after the trial court granted a directed verdict in favor of Rice. A motion for a directed verdict under SDCL 15–6–50(a) questions the legal sufficiency of the evidence to sustain a verdict against the moving party. *Denke v. Mamola,* 437 N.W.2d 205 (S.D.1989); *Carlson v. First Nat. Bank,* 429 N.W.2d 463 (S.D.1988); *Sabag v. Continental South Dakota,* 374 N.W.2d 349 (S.D.1985). Upon such a motion, the trial court must determine whether there is substantial evidence to continue the action. *Denke,* 437 N.W.2d at 207; *Carlson,* 429 N.W.2d at 466; *Sabag,* 374 N.W.2d at 355. At this point in the trial, the court, in making this determination, is not free to weigh the evidence or gauge the credibility of the witnesses. *Denke,* 437 N.W.2d at 207; *Baldwin v. First Nat. Bank of Black Hills,* 362 N.W.2d 85 (S.D.1985). The trial court, as well as this court on appeal, must view the evidence in a light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the evidence. *Denke,* 437 N.W.2d at 207; *Carlson,* 429 N.W.2d at 466; *Kreager v. Blomstrom Oil Co.,* 379 N.W.2d 307 (S.D.1985). If, when so viewed, there is any substantial evidence to sustain the cause of action or defense, it must be submitted to

the finder of fact. *Denke, supra; Baldwin, supra.*

## ISSUE I

DID THE TRIAL COURT ERR IN HOLDING THAT PUNITIVE DAMAGES WERE NOT RECOVERABLE FROM FIRST BANK IN THE UNDERLYING CAUSE OF ACTION?

■■ In a legal malpractice case, the plaintiff must prove:

1. the existence of an attorney-client relationship giving rise to a duty;

2. that the attorney, either by an act or a failure to act, violated or breached that duty;

3. that the attorney's breach of duty proximately caused injury to the client; and

4. that the client sustained actual injury, loss or damage.

*Burke v. Roberson,* 417 N.W.2d 209 (Iowa 1987), *citing* D. Meiselman, *Attorney Malpractice: Law and Procedure,* § 3:1, pp. 39–40 (1980); R. Mallen and J. Smith, *Legal Malpractice,* § 27.5, p. 635; (1989); *see also Basic Food Industries, Inc. v. Grant,* 107 Mich.App. 685, 310 N.W.2d 26 (1981); 7 Am. Jur.2d, *Attorneys at Law,* § 223. Concerning the third element, proximate cause, Meiselman states:

> [I]n attorney malpractice, the causal requirement is worded in the negative. For example, it is often said that the plaintiff can recover against the defendant-attorney only when it can be shown that the injury would not have occurred "but for" the negligence of the lawyer. Thus, the plaintiff must establish that the total or partial loss would not have occurred had it not been for some act or omission on the part of the attorney. In other words, the plaintiff must show that "but for" the negligence of the lawyer, the client's cause of action or defense against a claim in the underlying action would have been successful.

*Meiselman, supra* at 40.

A client's burden of proving injury as a result of his attorney's negligence is especially difficult to meet when the attorney's con-

duct prevented the client from bringing his original cause of action or the attorney's failure to appear caused judgment to be entered against him as a defendant. In addition to proving negligence a client must show that but for his attorney's negligence he would have been successful in the original litigation. " 'Accordingly, the client seeking recovery from his attorney is faced with the difficult task of proving two cases within a single proceeding.' " *Basic Food Industries, Inc. v. Grant,* 310 N.W.2d at 29, *citing* 45 A.L.R.2d 5, § 2.

The manner in which the plaintiff can establish what should have transpired in the underlying action is to recreate, i.e. litigate, an action which was never tried. This procedure of recreating the underlying action is known as a suit within a suit, a trial within a trial, an action within an action, a case within a case, to name but a few of the designations. *Meiselman, supra,* § 3:5; *Mallen & Smith, supra,* §§ 27.1, et seq. The objective is to establish what the result would have been had the case been filed. *Mallen & Smith, supra,* at § 27.7. This is the accepted and traditional means of resolving the issues involved in the underlying proceedings in a legal malpractice action. *Id.* This procedure amounts to trying two separate and distinct lawsuits.

■ Thus, the plaintiff in a legal malpractice case has not only to prove the four elements basic to negligence cases, but may be asked to prove three additional factors: 1) that the underlying claim was valid, 2) that it would have resulted in a favorable judgment had it not been for the attorney's error, and 3) the amount of the judgment and that the judgment was collectible. *Meiselman, supra,* § 3:5.

■ A showing of proximate cause requires proof that the client would not have only prevailed in the underlying claim but that a judgment in the client's favor would have been collectible. *Taylor Oil Co. v. Weisensee,* 334 N.W.2d 27 (S.D.1983); *Burke v. Roberson, supra; Whiteaker v. State,* 382 N.W.2d 112 (Iowa 1986); *Pickens, Barnes & Abernathy v. Heasley,* 328 N.W.2d 524 (Iowa 1984).

The trial-within-a-trial procedure often makes it desirable to bifurcate, that is try separately, the underlying action or actions. *Mallen & Smith, supra,* § 27.24.

The standard of care as an issue is distinct and separate from the issue of what should have happened in the underlying proceeding. Separate trials can provide a cogent and clear evidentiary process, minimizing the risk of confusing a jury. *Id.,* at p. 642.

Bifurcation of the issues can also be achieved with separate instructions for the jury concerning the underlying claim, the legal malpractice claim, and the total case. *Mallen & Smith, supra,* §§ 27.24–25 (1992 supplement). In *Nika v. Danz,* 199 Ill. App.3d 296, 145 Ill.Dec. 255, 556 N.E.2d 873 (Ill.App.1990), the jury was given three sets of instructions: one for the legal malpractice claim, a second concerning the hypothetical, underlying action and a third set covering both cases. In effect, the method of using three sets of instructions separated the liability issue in the legal malpractice case from the damages issue. *Nika,* 199 Ill.App.3d 296, 145 Ill.Dec. at 266, 556 N.E.2d at 884.

In the present case a portion of the cause of action constitutes a case within a case: the foreclosure action of First Bank as plaintiff where it is alleged that Rice failed to defend and counterclaim.

The trial court did not compel either party to file a separate complaint, answer and counterclaim specifically delineating each issue and affirmative defense. This is discretionary with the trial court and is often required by the trial court to isolate issues and aid the court in ultimately instructing the jury as to the law that applies within the case within a case.

It would certainly appear that each case has to be viewed within the unique circumstances of its factual situation when the trial court determines procedurally how to approach the jury with the same. *See Nika, supra.*

The trial court at the pretrial hearing on March 22, 1992, held that the prayer for punitive damages in the case within the case (First Bank foreclosure action) could not be pursued, based on the fact that there had

been no pretrial hearing pursuant to SDCL 21-1-4.1 which provides:

In any claim alleging punitive or exemplary damages, before any discovery relating thereto may be commenced and before any such claim may be submitted to the finder of fact, the court shall find, after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the *party claimed against.* (emphasis added).

First Bank is not a party to the present cause of action as defined under SDCL 21-1-4.1. First Bank is the plaintiff in a foreclosure action defending a counterclaim in the case within a case.

■ Rice's attorney at the pretrial further argued before the trial court that "as a matter of law in this case, which is a contract case, punitive damages are not recoverable." The conclusion of counsel is in error.

A legal malpractice suit may have two causes of action, one which is for breach of contract and another in negligence. *Meiselman, supra* § 8:2. The case within a case may be based in contract, tort or equity. *Porter v. Kruegel,* 155 S.W. 174 (Texas 1913); *Patterson & Wallace v. Frazer,* 79 S.W. 1077 (Texas 1904); 60 West Virginia Law Review 225 (1958).

Since separate pleadings were not required by the trial court, this Court must review the multiple pleadings including First Bank's original pleadings and any affirmative defenses set forth therein. Upon reviewing the multiple pleadings and bearing in mind that this is a second time that the case has been tried, we find that Haberers as the defendant counterclaimant in the case within a case effectively pled among other things, a punitive damage claim for fraud and intentional infliction of emotional distress. The punitive damages which may have been awarded in the underlying claim are part and parcel of the damages Haberer suffered as a result of Rice's alleged negligence.

It is further noted that the parties at the time of the pretrial motions stipulated that any judgment against First Bank in the case within a case was collectible. This necessi-

tated no discovery upon the punitive damages claim and relates specifically to First Bank's next motion in limine to prohibit evidence of insurance coverage for First Bank in the case within a case as it may under certain circumstances be admissible to prove the required element of collectibility. *Hammons v. Schrunk,* 209 Or. 127, 305 P.2d 405 (1956); 73 Marquette Law Review 40 (1989).

The purpose of SDCL 21-1-4.1 is not present in the case within a case. *Brandriet v. Norwest Bank,* 499 N.W.2d 613 (S.D.1993) (Wuest, J., concurring specially). It is further noted that the matter was tried in the first trial before the court without a jury. The record at the first trial does not reflect an objection or a motion to strike the prayer for punitive damages in the case within a case. Having previously tried the issues without an objection, the defense can certainly not argue surprise and cannot be said to have been prejudiced or caught unaware of the evidence surrounding the same. Again, the legislative requirement and intent does not exist in the present case.

The trial court erred in holding that punitive damages were not recoverable from First Bank in the underlying cause of action.

## ISSUE II

SHOULD THE HABERERS HAVE BEEN PERMITTED TO SEEK DAMAGES FOR RICE'S NEGLIGENT REPRESENTATION OF THEM ON THE LAND TRANSACTION WITH MELVIN LEHR?

■ Merle and Florence Haberer allege that Rice called Merle Haberer and informed him that Bob DeVaan and Melvin Lehr were in his office wanting to buy the Bowdle property. They immediately went to Rice's office and met with Rice, DeVaan and Lehr. They ultimately agreed upon the sale of some property in Bowdle for $30,000. They further allege that Rice insisted that they sign a deed to the property then and there, without a written contract, and without receiving a check for the same. Haberer's further allege that they refused to sign and that Rice prevailed and delivered the deed to Lehr. They further allege that no compensation was ever

received for the transaction and that Rice took no further action to collect the same. Rice denies this.

The matter was tried in the first trial before the court. Rice argues that the present cause of action is not ripe and that Haberers must show that they have exhausted all other remedies and pursued any and other actions to success or failure. After the first trial Haberers did sue DeVaan and Lehr; DeVaan subsequently took bankruptcy resulting in a partial stay.

The trial court recognized that the moneys allegedly due were to be paid to First Bank pursuant to Rice's stipulation with First Bank. The court ruled that the action was not ripe for resolution and denied Haberers the opportunity to try the same.

■ SDCL 15–2–14.2 governs the time for bringing legal malpractice actions. South Dakota follows the occurrence rule. Under the occurrence rule as expressed by our statute, the statute of limitations on a claim of attorney malpractice begins to run at the time of the alleged negligence and not from the time when the negligence is discovered or the consequential damages are exposed. *Kurylas, Inc. v. Bradsky,* 452 N.W.2d 111 (S.D.1990); *Schoenrock v. Tappe,* 419 N.W.2d 197 (S.D.1988); *Hoffman v. Johnson,* 374 N.W.2d 117, 122 (S.D.1985); Annot. 18 A.L.R.3d 978, 986–987 (1968); *Meiselman, supra,* §§ 5:4, 5:6, 5:7.

In *Schoenrock v. Tappe, supra,* a cause of action for negligently examining a title occurred at the time the attorney provided the client with the erroneous information, in effect when the omission occurred. The statute of limitations would commence to run at the time of the loss to Haberer due to Rice's alleged negligence, at the time that the deed was delivered to Lehr without compensation. At that time Haberer suffered a loss of the value of the property previously owned by him which he transferred at Rice's insistence. The value of the property can be determined in a number of ways. The determination of the value of the property is either the agreed upon sale price or, if the same cannot be determined, the reasonable fair market value of the same at the time and the place of the transfer of the property.

All of Haberers' contact with Rice during this period of time constituted a continuing effort to obtain financing and to pay various debts. This was not an isolated transaction but an additional attempt to obtain moneys to pay creditors and is specifically mentioned as a part and parcel of the stipulation which Rice entered into without the consent of his clients. During these transactions, Rice was also acting in a fiduciary capacity. *See Rosebud Sioux Tribe v. Strain,* 432 N.W.2d 259, 264 (S.D.1988) ( [t]he nature of the relationship between attorney and client is highly fiduciary. It requires the highest degree of fidelity and good faith. It is a purely personal relationship, involving the highest personal trust and confidence).

Once attorney Rice had been sued, he had the option under our rules of civil procedure to implead third party defendants. SDCL 15–6–14(a).

Under the occurrence rule, the harm Haberer suffered occurred on the date when the deed was transferred to Lehr without Haberer receiving payment for his land, i.e., the date of Rice's alleged negligent act or omission. The trial court erred in not allowing Haberer to pursue this claim and offer evidence of related losses.

## ISSUE III

DID THE HABERERS INTRODUCE SUFFICIENT EVIDENCE TO CREATE A JURY ISSUE ON THE QUESTION OF DAMAGES?

Due to our ruling on Issues I and II, this will not need to be addressed in detail, as the issue of damages in the case within the case and on the land transaction must be tried.

■ Proof of damages proximately caused by negligence is a fundamental element of a malpractice action. When the alleged legal malpractice consists of a client's assertion that the defendant lawyer has mishandled a claim or lawsuit, proof of damages necessarily involves analysis of the value of that underlying cause of action. *Burke,* 417 N.W.2d at 211; *Whiteaker,* 382 N.W.2d at 114.

■■■■ An attorney is liable for all damages proximately caused by the wrongful act or omission. *Taylor Oil Co. v. Weisensee, supra; Dessel v. Dessel,* 431 N.W.2d 359 (Iowa 1988); *Mallen & Smith, supra,* § 16.4. Compensatory damages for negligence are those which· flow directly and proximately from a defendant's breach of his duty to plaintiff. *Scognamillo v. Olsen,* 795 P.2d 1357, 1361 (Colo.App.1990). If the defendant attorney's negligence results in entry of a judgment when there otherwise would not have been judgment, the proper measure of damages is the entirety of the prior judgment regardless of the theory upon which the prior judgment was entered or the nature of the damages assessed thereunder. *Id.; Hunt v. Dresie,* 241 Kan. 647, 740 P.2d 1046 (1987).

Thus, the punitive damages assessed in the underlying case are part and parcel of the damages plaintiffs suffered as a result of the defendant's alleged negligence. *Scognamillo, supra,* 795 P.2d at 1361.

■■■■ The trial court granted Rice's directed verdict motion in both the underlying case and the primary case due to Haberers' failure to show that their business would have been successful. The trial court in effect limited the Haberer claim under rules applicable to cases seeking to recover lost profits. This ignores the underlying case and any damages determined therein. The underlying case has a claim that First Bank allegedly breached its promise to lend money to Haberer. Where a breach of contract has prevented an anticipated gain and made proof of loss difficult to ascertain, the injured party has a right to damages based upon his reliance interest, including expenditures made in preparation for performance, or in performance, less any loss that party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed. *Hartzman v. Hightower Productions, Ltd.,* 53 Md.App. 656, 456 A.2d 82 (1983).

The law distinguishes between those cases in which there is a question about the fact of whether damages have been incurred and those in which only the measure or amount of damages is uncertain. *Keegan v. First*

*Bank of South Dakota,* 470 N.W.2d 621, 624 (S.D.1991); *Schmidt v. Wildcat Cave, Inc.,* 261 N.W.2d 114 (S.D.1977); *Wang v. Bekken,* 310 N.W.2d 166 (S.D.1981). In the former case, reasonable certainty is required in proving the fact and cause of the loss; once those elements have been proven, the amount of damages need not be shown with the same degree of certainty. *Keegan, supra;* 22 Am.Jur.2d *Damages,* §§ 486–87.

In a nutshell, Haberer did produce sufficient evidence to create a jury issue on the issue of damages in both the underlying cause of action and the primary cause of action. The trial court erred in directing a verdict in favor of Rice.

We reverse and remand for proceedings consistent with this opinion.

SABERS, J., concurs.

MILLER, C.J., and HENDERSON and AMUNDSON, JJ., concur specially.

McMURCHIE, Circuit Judge, for WUEST, J., disqualified.

HENDERSON, Justice (specially concurring).

Attorney George Rice's questionable representation of client Merle Haberer is well-documented by the majority opinion. However, this is not enough for Haberer to succeed on appeal. He must also prove that he would have been successful in the original litigation had Rice provided competent counsel. *Taylor Oil Co. v. Weisensee,* 334 N.W.2d 27 (S.D.1983).

When, on May 9, 1983, Haberer, Ed Van Meter (friend of Haberer and investor), and Rice met with First Bank officer Robert Gruman, they were led to believe that First Bank was committed to loaning Haberer $150,000. An oral agreement is not enough, however. *Werner v. Norwest Bank,* 499 N.W.2d 138 (S.D.1993). Thereafter, Peter Mehlhaff of First Bank, acting on behalf of Haberer Dairy & Farm Equipment, Inc., immediately applied for an SBA loan: $150,000 at 13.25% per annum interest for ten years. SBA's Sioux Falls office received the application on May 16, 1983. Meanwhile, Rice sent

a letter to Van Meter concerning Van Meter's assistance in obtaining the loan.

Unbeknownst to Haberer, who had previously been rejected by the SBA for a $250,000 loan, his new loan needed SBA approval. In fact, Mehlhaff did not even bother to have Haberer review or sign the forms. Using the previously rejected loan application, Mehlhaff simply attached the forms, including the old form with Haberer's signature, to the new application.

In the meantime, Haberer started up his business, incurring expenses and building up debts. When he did not receive his loan after the first week, he made inquiries to the Bank and to Rice. Both put him off stating that these things take time, yet they never discouraged him from building his business. Such exchanges repeatedly continued until, after nearly three months, the loan was rejected. First Bank, ever so helpful, offered to ease the financial burden by granting Haberer a $125,000 loan payable in 111 days at 14.5% annual interest. Due to the huge start-up expenses incurred, Haberer had little choice but to accept the strict loan conditions. Thus, in less than four months, Haberer needed to recoup $125,000. Had he received the $150,000 loan, the $2,262 monthly payments would have only amounted to $9,048 over the same period. Simple math proves the dream would not have collapsed had the Bank done its job and had Rice been diligent in his duties to protect his client's interest.

If the Bank and Rice had acted properly, either the Haberer investment would have received its loan or the investors would have been informed of the rejection at a much earlier date, avoiding unnecessary expenses. By their actions, the Bank and Rice encouraged Haberer to go further in debt. The pitfall is once Haberer was in no position to refuse, the Bank had the audacity to "assist" Haberer by charging him with higher interest and a ridiculously short term. There was no way he could make it.

Based on the stranglehold by the Bank, Haberer certainly has a meritorious defense to the foreclosure. It is also apparent that even in a light most favorable to Rice and the Bank, a shadow befalls the handling of the events surrounding the loan application. *Lytle v. Morgan,* 270 N.W.2d 359 (S.D.1978). A jury will determine if the remaining silhouette is a breach of contract.

I am authorized to state that Chief Justice MILLER joins this special writing.

AMUNDSON, Justice (concurring specially).

In Count V of Haberers' complaint, they allege that Rice failed to answer First Bank's complaint for default on their $125,000 loan. Haberers claim that this deprived them of the opportunity to interpose defenses and counterclaims. There is no factual dispute that Rice failed to prepare and file an answer or counterclaim. *See Haberer v. First Bank of South Dakota,* 429 N.W.2d 62 (S.D.1988). Also, in this prior decision, this court found that the evidence showed that Haberers agreed to and accepted the terms of the new $125,000 loan agreement.

This new agreement must be the focal point to determine whether Haberers would have been successful in obtaining a judgment against First Bank of South Dakota. This court held in *Quick v. Bakke, Kopp, Ballou & McFarlin, Inc.,* 380 N.W.2d 364, 366 (S.D. 1982), as follows:

> A written agreement supersedes all previous understandings and the intent of the parties must be ascertained therefrom, except, of course in cases involving fraud, mistake or ambiguity. (Citations omitted.)

Also, SDCL 53-8-5 provides:

> The execution of a contract in writing, whether the law requires it to be written or not, supersedes all oral negotiations or stipulations concerning its matters which preceded or accompanied the execution of the instrument.

The pleadings in this case do not allege any fraud, mistake or ambiguity as it relates to the First Bank foreclosure action. Therefore, when this case is retried, the question which should be addressed by the trial court is whether or not Haberers would have been successful in obtaining a judgment against First Bank in the foreclosure action on the $125,000 note or contract. *See Smith v.*

*Even,* 53 S.D. 369, 220 N.W. 878 (1928). What transpired during the negotiation for the $250,000 SBA loan or the alleged $150,-000 loan commitment should have no bearing on the case within a case. The issue is whether Haberers had a meritorious defense to the $125,000 foreclosure action or a meritorious counterclaim limited to the $125,000 note.