**Dexter Dean SMITH and Mary E. Smith, Plaintiffs,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant.**

**Civ. A. No. 94–1086–MLB.**

United States District Court, D. of Kansas.

Oct. 10, 1995.

Dan E. Turner, Phillip L. Turner, Turner & Turner, Topeka, KS, for plaintiffs.

Richard L. Honeyman, Linda S. Parks, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, for defendant.

### MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on the parties' motions for summary judgment (Docs. 98, 99). The parties have responded to the motions and the court is prepared to rule.

### Undisputed Facts

Plaintiff Dean Smith's mother, Zella Smith, was admitted to a nursing home in 1982. Zella Smith owned real property in Pawnee County, Kansas, and in 1983, she executed a document giving Dean Smith ("plaintiff") power of attorney to mortgage her property. The 1983 power of attorney was prepared by attorney Jerry Larson and was not recorded.

In 1984, plaintiff applied for a loan of $60,000 at Investors Savings & Loan Association ("Investors") using Zella Smith's land as collateral. Plaintiff gave Investors' loan officer, David Ackerman, a copy of the 1983 power of attorney which granted him the power to mortgage Zella Smith's property. Plaintiff told Ackerman that he was applying for the loan on behalf of his mother, as she required some $1,800 a month for her care

(Doc. 101, Ackerman Dep., Ex. 22 at 60–61; Doc. 113, Smith Dep. at 141).

Investors' attorney, Rae Batt, issued a preliminary title opinion on April 19, 1984, correctly stating that the 1983 power of attorney properly granted plaintiff power to mortgage Zella Smith's property, but he required that the power of attorney be recorded (Doc. 101, Ackerman Dep. at Ex. 2). Six days later, on April 25, 1984, Zella Smith executed a new document which granted plaintiff power of attorney which did *not* include the power to mortgage real property (Doc. 101, Ackerman Dep. at Ex. 13).

The 1984 power of attorney was prepared at plaintiff's request by attorney Donald L. Burnett. Larson and Burnett were associated in law practice but Burnett was unaware that Larson had prepared the 1983 power of attorney. Burnett's standard power of attorney form included the power to mortgage land, but based upon what he understood plaintiff was requesting, Burnett deleted the provisions relating to selling or mortgaging real estate (Doc. 101, Burnett Dep. at 24).[1] Burnett had no contact with or input from Zella Smith concerning the power of attorney (Doc. 101, Burnett Dep. at 29) and did not know for what purpose it was to be used (Doc. 101, Burnett Dep. at 26).

The 1984 power of attorney was recorded on April 25, 1984. The same day, plaintiff obtained the loan from Investors by executing a note and mortgage on Zella Smith's property. He signed the documents as "Dean Smith POA Zella P. Smith" (Doc. 100, Uncontroverted Fact at ¶ 2). On May 4, 1984, attorney Batt issued a final title opinion, stating the requirements in his preliminary opinion had been met (Doc. 101, Ackerman Dep. at Ex. 3).

Zella Smith passed away in 1985. Plaintiff and his brother, Rex, petitioned for issuance of letters of administration in the District Court of Pawnee County, Kansas (Doc. 100 at Ex. C). Thereafter, plaintiff's sister, Donna Jones, petitioned for removal of plaintiff as co-administrator. Eventually, the court ordered that both plaintiff and Rex be removed and that the First State Bank & Trust Co. of Larned, Kansas be appointed as corporate administrator.

Shortly before the successor administrator was appointed, plaintiff's brother and sister filed a civil action against plaintiff in the District Court of Pawnee County. They demanded an accounting of plaintiff's management of Zella Smith's financial matters (Doc. 100 at Ex. F) ("accounting action"). They named Investors as a defendant because it held the mortgage and note executed by plaintiff in 1984. Jones and Smith challenged the mortgage because the 1984 power of attorney did not give plaintiff the capacity to mortgage real property.[2] Batt filed an answer, cross-claim and counter claim on behalf of Investors (Doc. 110 at Ex. G).[3] Batt then notified St. Paul Fire and Marine Insurance Company ("St. Paul"), his professional liability carrier, of a potential claim against him. He admitted that he had misread the 1984 power of attorney (Doc. 110, Letter of Oct. 2, 1986). He also informed David Ackerman, an officer at Investors, of his mistake and that he had notified St. Paul (Doc. 110, Ackerman Dep. at 31, 33).

On October 6, 1986, Michael Vogt, a St. Paul claims representative, called Batt, who confirmed that he had misread the power of attorney. Based on what Batt told him and on allegations in the accounting action that plaintiff had acted beyond the scope of his authority and had violated his fiduciary relationship in obtaining the loan (Doc. 100 at Ex. H), Vogt noted to his file "we will cross-claim" against plaintiff (Doc. 110, Vogt Dep. at Ex. 4). Vogt then contacted B.G. "Skip" Larson, an experienced Kansas attorney, to

---

1. If this finding sounds vague, it is because plaintiff's counsel instructed Burnett not to answer questions regarding what he and plaintiff discussed regarding the preparation of the 1984 power of attorney, citing attorney-client privilege (Doc. 101, Burnett Dep. at 23).

2. The court did not resolve whether Investors' mortgage was valid, because the property subject to the mortgage was eventually deleted from the action (Doc. 100 at Ex. J).

3. Plaintiffs do not base their malicious prosecution claim on this pleading. Rather, as discussed *infra,* their claim is based upon pleadings filed in the Federal Land Bank action and subsequent filings (Doc. 3 at ¶ 16).

represent St. Paul's interests and the interests of Rae Batt.[4] Larson's job was to investigate and evaluate the claim against Batt and, if necessary, enter a defense (Doc. 110, Vogt Dep. at Ex. 5). Batt continued to represent Investors and was part of various legal proceedings involving plaintiff and Investors. Batt and Larson jointly signed pleadings and appeared in court together in some of these proceedings as counsel for Investors (Doc. 113, Larson Dep. at 18).

Although there was no question as to Batt's liability for his mistake in reading the 1984 power of attorney, St. Paul, through actions taken in various cases by Larson and/or Batt on behalf of Investors, sought to recover money from plaintiff in order to mitigate the loss suffered by Investors and hence its own liability (Doc. 113, Larson Dep. at 23, 24–25; Doc. 110, Vogt Dep. at Ex. 4). Investors did not specifically authorize these actions taken in its name, believing that its only relief would come from St. Paul because neither Smith nor Batt were financially able to cover its loss (Doc. 110, Ackerman Dep. at 34–35, 46, 59, 67). Investors never sued Batt for malpractice.

Investors knew of the proceedings taken in its name, however, as Batt kept Ackerman appraised of what was discovered about the mortgage as things progressed and of actions that were taken. For example, Batt informed Ackerman that plaintiff used the loan proceeds for his own benefit, prompting a "cross-petition" in the Federal Land Bank case (discussed *infra*) in order to recover some of the loan money, which then could be used "as a credit on the note and mortgage" (Doc. 101, Ackerman Dep. at Ex. 1; Doc. 110 at ¶ 16). Batt provided Ackerman with copies of pleadings filed in Investors' name. Batt was a member of Investors' board of directors. There is no evidence that Investors ever directed Batt or Larson *not* to take action in its name to recover monies from plaintiff or affirmatively disavowed anything they did in Investors' name.[5]

Vogt, who never met Dean or Mary Smith (Doc. 101, Vogt Dep. at 136), testified about his understanding of the attempt to recover from plaintiff:

Q. So as of October 16 [1986] ... you knew that you were going to have to pay the claim of Investors Savings & Loan in full?

. . . .

A. I believe there was a big question as to damages in this case.

Q. Okay. What was that question?

A. Whether Investors Savings & Loan would in fact suffer any loss.

Q. And what did you base that on?

A. Advice of counsel.

Q. And what was that advice?

A. There was an ongoing matter, ongoing litigation and efforts to recover the monies that had been loaned.

. . . .

A. ... [W]e wanted to make sure that everything was being done by Investors Savings & Loan that they reasonably could in order to mitigate their loss or their potential loss.

Q. Investors Savings & Loan didn't have to sue Dean Smith, they could have just made the claim against Mr. Batt, correct?

A. They could have, but they may not have gotten paid the entire amount because they have a duty to mitigate their loss. And if they have not done that, then possibly there could have been a compromise of the claim.

(Doc. 113, Vogt Dep. at 25–26, 98–99).

*The Federal Land Bank Foreclosure Case*

In November 1986, Federal Land Bank, a creditor of plaintiff, filed a mortgage fore-

---

4. There is nothing in the file to indicate that Vogt was aware of the unrecorded 1983 power of attorney. Larson testified that he did not learn of its existence until the night before his deposition was taken in this case.

5. Plaintiffs claim that St. Paul's "ill will is implied by St. Paul's actions contrary to Investors' actions" (Doc. 110 at ¶ 32). No such implication can be made. The evidence, viewed most favorably to plaintiffs, shows *in* action, not action, by Investors.

closure action against plaintiff in the District Court of Pawnee County (Doc. 100 at Ex. K) ("Federal Land Bank case"). The bank named Investors as a party defendant because Investors had claimed an interest in the same real estate during the litigation brought by Rex Smith and Donna Jones (Doc. 100, Ex. K at 3–4).

On February 13, 1987, Robert Keenan, who represented Rex Smith and Donna Jones in their lawsuit against plaintiff, wrote to Rae Batt. The letter stated:

A study of the Answers to my Interrogatories directed to D. Dean Smith, Exhibit "A", indicates:

a. A deposit of your client's mortgage loan proceeds in amount of $60,000.00 to "Dean Smith, Farm Account" on April 26, 1984, less $500.00 cash;

b. Check No. 117 dated April 25, 1984, to Federal Land Bank in amount of $40,000.00, which check was presented for payment April 27, 1984.

Enclosed please find copies of the "itemized check list", the deposit slip, above referred, and, the cancelled check, above referred.

Since Dean Smith falsely represented to your client that this money was being borrowed by him, as Attorney-in-Fact for Zella Smith, and since his documents confirm that the same was not deposited to her account, but rather to, "Dean Smith, Farm Account" and, that in addition thereto, he prepaid Federal Land Bank the sum of $40,000.00 under date of April 25, 1984 (presented for payment April 27, 1984), which sum was credited to the indebtedness being foreclosed in District Court Case No. 86 C 100.

It appears to me that these funds ($60,000.00) having been obtained by misrepresentation and deceit on his part, from your client, and all contrary to the avowed purpose (as Attorney-in-Fact for Zella Smith), deposited the same to his personal account and drew the sum of $40,000.00 to apply toward the Federal Land Bank mortgage,

affords you an opportunity to ask the District Court to impress a constructive trust against this $40,000.00 to be repaid out of the proceeds of the foreclosure sale.[6]

Keenan added a handwritten note on the letter which stated, "I would like to see your client press charges [against] Dean—this is an offensive crime!" (Doc. 101, Keenan Dep. at Ex. 1).[7] Rae Batt forwarded the letter to Larson.

On February 16, 1987, Larson forwarded Keenan's letter to Vogt, and wrote that he felt Keenan's suggestion about the constructive trust was valid and that he would discuss the filing of such a petition with Rae Batt (Doc. 101, Vogt Dep. at Ex. 14).

On February 24, Larson filed a cross-petition for Investors in the Federal Land Bank foreclosure action, alleging fraud against plaintiff and requesting a constructive trust on proceeds from the loan (Doc. 100 at Ex. L). Larson wrote a letter to Vogt (Doc. 101, Vogt Dep. at Ex. 15) informing him of the action taken. Plaintiffs' malicious prosecution claim arises out of the filing of the cross-petition and the later actions taken by Larson which are discussed below (Doc. 3, Amended Complaint at ¶ 16; Doc. 106, Pretrial Order).

On June 17, 1988, Vogt made a note to the file that Larson should investigate Burnett's role in the execution of the power of attorney (Doc. 101, Vogt Dep. at 73). On June 20, Larson telephoned Burnett. According to Larson, Burnett said during their conversation that he had explained the contents of the 1984 power of attorney to plaintiff after he prepared it, and that plaintiff was aware that the 1984 power of attorney did not give him the power to mortgage Zella Smith's land when he signed the note and mortgage for his loan (Doc. 101, Larson Dep. at 102). Larson verbally reported this conversation to Vogt (Doc. 101, Larson Dep. at 104–05). Vogt could not specifically recall the conversation but stated the substance of the conversation was "something I knew as a matter or

---

**6.** In their response, plaintiffs purport to deny these facts (Doc. 110 at ¶ 15). The basis for the denial is unstated and unsupported. The facts are deemed admitted. D.Kan.Rule 206(c).

**7.** There is no evidence that Investors ever pursued criminal charges against plaintiff.

course" (Doc. 101, Vogt Dep. at 125, 127–29). Vogt also stated that Larson's conversation with Burnett was a factor in St. Paul's pursuance of the fraud claim against plaintiff (Doc. 101, Vogt Dep. at 129).

Burnett does not recall telling Larson that plaintiff knew he did not have the power to mortgage property when he obtained the loan from Investors, and doubts that he would have done so (Doc. 101, Larson Dep. at 43–44). There is no documentation in either Larson's or Vogt's files that confirms what Burnett allegedly told Larson, or that Larson had reported it to Vogt. There is only Larson's billing statement, which indicates that on June 20, Larson had a conversation with Burnett regarding "intent of the power of attorney" (Doc. 103, Larson Dep. at 101, Ex. 30).

In November 1989, plaintiff filed a motion to dismiss Investors' fraud claim in Federal Land Bank's foreclosure action on the grounds that the two-year statute of limitations for fraud barred Investors' claim (Doc. 100 at Ex. U). The state court agreed, and dismissed Investors' fraud claim (Doc. 100 at Ex. V). The state court did not reach the merits of Investors' claim.

On April 5, 1990, St. Paul paid Investors' claim against Rae Batt and Investors assigned to St. Paul any interest in the fraud claim against plaintiff. St. Paul appealed in Investors' name the decision dismissing the fraud claim to the Kansas Court of Appeals. St. Paul contended that the alleged fraud was not discoverable until the probate of Zella Smith's estate, thus tolling the statute of limitations. St. Paul also contended that a payment made by plaintiff on the note one year after it was executed was a second act of fraud and further prevented Investors from discovering the original fraudulent act (Doc. 113, Kansas Court of Appeals Order at 3). Vogt testified as to his understanding of St. Paul's appeal:

Q. And the basis for your continuing to prosecute those claims was what?

A. Mr. Larson's advice.

Q. He advised you that you could continue to prosecute those claims?

A. That we had a good chance to win.

Q. Did he discuss with you the basis of his opinion that you had a good chance to win?

A. As I understood it, this is kind of just my recollection, that the underlying claims had been dismissed because of statute of limitations and that there was an exception to that with regard to the discovery rule as to when the alleged fraud was discovered.

Q. And that is why you agreed to continue to prosecute those claims, based on that advice?

A. Yes.

(Doc. 113, Vogt Dep. at 111–12).

In February 1994, the Kansas Court of Appeals affirmed the trial court's dismissal of Investors' fraud claim, finding Investors could have discovered plaintiff's alleged fraud at the time he executed the note, and that the statute of limitations barred the claim (Doc. 110 at Ex. SP455).

### The Quiet Title Case

In March 1988, the estate of Zella Smith filed a quiet title action against Investors regarding the mortgage executed by plaintiff. The state court ruled in August 1988 that Investors' mortgage was invalid because plaintiff did not have the capacity to mortgage Zella Smith's property under the 1984 power of attorney (Doc. 100 at Ex. 0–1).

### The Bankruptcy Cases

In March 1987, Mary and Dean Smith filed for Chapter 11 bankruptcy. Larson and Batt engaged Chuck Engel, a bankruptcy attorney, to represent Investors in the bankruptcy action (Doc. 101, Larson Dep. at 68–69). Investors itself did not retain Engel. St. Paul paid Engel's bills because it was Vogt's understanding that Investors could claim attorneys fees as part of its damages (Doc. 101, Vogt Dep. at 115, 137). Vogt did not have any direct contact with Engel (Doc. 101, Vogt Dep. at 114).

On April 19, 1988, Engel wrote Batt that he did not advise Investors to object to plaintiffs' discharge in bankruptcy based upon Dean Smith's alleged fraud, because there

was no evidence that plaintiff "caused the Power of Attorney to be published with the intent to hinder or deceive Investors Savings." Engel did, however, recommend an objection to plaintiffs' discharge on other grounds (Doc. 101, Vogt Dep. at Ex. 21). Batt forwarded the letter to Larson, who in turn forwarded it to Vogt (Doc. 101, Vogt Dep. at 68–69).

Engel's firm filed a proof of claim in plaintiffs' Chapter 11 proceeding in March 1988 on behalf of Investors, and filed an objection to plaintiffs' reorganization plans in July 1990. In August, plaintiffs' Chapter 11 bankruptcy was dismissed (Doc. 100 at Ex. W). Plaintiffs then filed for bankruptcy under Chapter 12, which was voluntarily dismissed on December 28, 1990. On April 22, 1991, plaintiffs again filed for Chapter 12 bankruptcy which eventually ended in a confirmed plan March 12, 1993. The parties agreed that Investors' claim would be treated outside the plan, i.e., paid only if St. Paul prevailed on its appeal (Doc. 100, Uncontroverted Fact at ¶ 30).

### This Case

Plaintiffs filed this diversity action on April 19, 1994, alleging various state law claims. Plaintiffs claim malicious prosecution (Count I), tort of outrage (Count II), punitive damages (Count III), intentional infliction of emotional distress (Count IV), tortious interference with business relations (Count V), and abuse of process (Count VI). Plaintiffs contend that St. Paul knew that the cross-claim for fraud in the Federal Land Bank's foreclosure action was frivolous, and that despite this knowledge, St. Paul asserted in plaintiffs' Chapter 11 proceeding that it was a creditor and voted against the plaintiffs' Chapter 11 plan of reorganization (Doc. 3, Amended Complaint at ¶ 24). Plaintiffs further contend that as a result of St. Paul's objection to their proposed plan, plaintiffs' Chapter 11 proceeding was dismissed and plaintiffs were not able to refinance their farming operations (Doc. 3, Amended Complaint at ¶ 24), resulting in damages.

St. Paul counterclaimed for false pretenses, breach of contract, promissory estoppel and unjust enrichment (Doc. 6). St. Paul asserts its claims only by way of set-off, as the applicable statutes of limitations have expired (Doc. 108 at 14 n. 2). Both parties then moved for summary judgment.

### Summary Judgment Standards

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is appropriate only if the record, viewed in the light most favorable to the nonmoving party, shows the moving party is entitled to summary judgment. *Leadville Corp. v. United States Fidelity and Guar. Co.*, 55 F.3d 537, 539 (10th Cir.1995). Because the district court's responsibility is to determine whether there is a need for a trial, the party opposing summary judgment must demonstrate the existence of specific issues of material fact for resolution by the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment should be granted where the moving party demonstrates that an essential element of proof is without factual support. *Jensen v. Johnson County Youth Baseball League*, 838 F.Supp. 1437, 1441 (D.Kan.1993). Summary judgment is appropriate when the facts, viewed in favor of the non-moving party, are insufficient to present a jury issue. *Bingaman v. Kansas City Power & Light Co.*, 1 F.3d 976, 980 (10th Cir.1993).

### St. Paul's Motion for Summary Judgment

#### Malicious Prosecution Elements

The definitive Kansas case concerning malicious prosecution is *Nelson v. Miller*, 227 Kan. 271, 607 P.2d 438 (1980). It specifies five elements which a plaintiff must prove:

1. The defendant initiated, continued, or procured civil proceedings against the plaintiff.

2. The defendant in so doing acted without probable cause.

3. The defendant acted with malice, that is, acted primarily for a purpose other than that of securing the proper adju-

dication of the claim upon which the proceedings are based.

4. The proceeding terminated in favor of the plaintiff.

5. The plaintiff sustained damages.

*Id.* at 276, 607 P.2d 438.

St. Paul concedes elements 1 and 5 for purposes of its motion (Doc. 100 at 14).

### Probable Cause

 Probable cause for instituting a civil proceeding exists when there is a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent person in the belief that the party committed the act of which he or she is complaining. In cases of malicious prosecution, the inquiry as to want of probable cause is limited to the facts and circumstances as they appeared to the defendant[8] at the time the prosecution was commenced. *Id.* at 277, 607 P.2d 438.

St. Paul contends that the uncontroverted facts show:

1. St. Paul had been told Dean Smith obtained a loan from Investors using his mother's real property and that he used most of the loan proceeds *for his own benefit.* According to St. Paul's information, Smith did this after representing to Investors that he was going to use the money for his mother's care (Doc. 100, Uncontroverted Facts at ¶¶ 15, 25).

2. Smith took these actions in spite of the fact that he was a fiduciary to his mother (Doc. 100, Uncontroverted Fact at ¶ 10).

3. Both Skip Larson and Rae Batt conveyed to St. Paul that Smith's attorney, Don Burnett, stated Smith *knew* he did not have the power to mortgage real property by virtue of the 1984

power, yet Smith obtained the $60,000 loan representing that he had such power (Doc. 100, Uncontroverted Facts at ¶¶ 20, 25).

(Doc. 100 at 15).

Plaintiffs respond that summary judgment is not appropriate because certain facts are in dispute concerning whether St. Paul had probable cause to pursue claims in Investors' name against plaintiff. Plaintiffs appear to contend that a dispute exists because the claims against plaintiff were pursued by St. Paul in Investors' name even though Investors never expected to recover from plaintiff. Plaintiffs claim that even though St. Paul knew it would have to pay Investors for Batt's mistake, it sought to avoid doing so by taking "control of the state court litigation in an attempt to leverage Dean Smith into paying Investors [sic] claim" (Doc. 110 at 14). Plaintiffs add that the most compelling evidence of lack of probable cause is the fact that Larson did not know of the unrecorded 1983 power of attorney until the night before his deposition was taken, that if Larson had done an "adequate investigation" and discovered the power of attorney, a claim would have been brought against Zella Smith's estate (Doc. 110 at 15).

The court fails to see any dispute of material facts. As can be seen from the detailed recitation of undisputed facts, the court accepts that St. Paul knew in October 1986 that Batt had erred and that it was liable to pay Investors although the amount of its liability was not fixed; that St. Paul was informed in February 1987 that plaintiff had obtained a loan from Investors for the stated purpose of paying his mother's bills and then, as alleged in the accounting action, used most of the money for his own purposes; that St. Paul authorized Larson to attempt to mitigate its exposure by pursing claims in Investors' name against plaintiff; that Investors did not

---

8. In their response, plaintiffs claim, "In analyzing the defense of probable cause it is necessary to look at what Investors knew or did not know" (Doc. 110 at 13). Clearly, this is *not* the correct standard, because Investors is not the defendant. *See also* PIK 2d 14.31:

Probable cause for instituting a civil proceeding exists when there are reasonable grounds for suspicion supported by circumstances suffi-

ciently strong in themselves to warrant a cautious or prudent man to believe that the party committed the act of which complaint is made. In determining the issue of probable cause, you **should consider only the facts and circumstances that were apparent to the defendant** in this action at the time the original proceeding was instituted.

(Emphasis added).

specifically "authorize" these actions, although it generally was aware of and did not object to them; that Larson did not know about the unrecorded 1983 power of attorney but that he "could" have learned about it, and that if he had known about it in 1986, they "would have gone against the estate of Zella Smith" (Doc. 110, Larson Dep. at 146).[9]

Attorney Keenan's February 13, 1987 letter is critical to the determination of probable cause because its contents were the basis of St. Paul's cross-claim of fraud in the accounting action. Plaintiffs do not dispute the existence of the letter and that St. Paul received it. Rather, they seem to *suggest* that a dispute exists about *Keenan's interpretation* of the interrogatory answers (Doc. 110 at ¶ 15) and that if Vogt had reviewed plaintiff's interrogatory answers, "he would have realized that Dean Smith's actions were proper" (Doc. 110 at ¶ 25).

Plaintiffs cite no facts in support of either of these contentions. The court is not required to speculate about whether a dispute exists, nor is it required to examine the interrogatory answers in an attempt to come to its own conclusions about the propriety of plaintiff's actions. Rather, following the standard announced in *Nelson v. Miller*, the court considers whether the letter constituted a reasonable ground for suspicion to warrant a prudent person to believe that plaintiff had committed fraud. The court finds that Keenan's letter, which cited plaintiff's sworn answers and Keenan's opinion as an attorney that plaintiff had committed fraud, gave St. Paul probable cause to file the cross-petition.

The court concludes that plaintiffs have failed to identify any disputed issues of material fact on the element of probable cause and that they have failed to show that St. Paul acted without probable cause. St. Paul is entitled to judgment as a matter of law.

### Malice

█ St. Paul claims that there is no evidence that it acted with malice (Doc. 100 at 19–20). Plaintiffs' response, *in its entirety*, is as follows:

As set forth above Investors did not look to nor expect Dean Smith to personally pay the promissory note; never demanded Dean Smith to personally pay the promissory note and did not believe that Dean Smith was legally responsible to pay the loan. Instead Investors looked to Rae Batt and his insurance carrier St. Paul to recover its loss.

St. Paul knew or should have known of Investors [sic] position since it was directing B.G. Larson to file such claims allegedly on behalf of Investors. Instead of paying on the malpractice claim St. Paul consciously chose to take control of the state court litigation involving Investors and other parties and asserted a fraud claim against Dean Smith. The actions of St. Paul being in direct conflict with Investors [sic] beliefs can only support the position that St. Paul wished to leverage Dean Smith in having to pay off Investors when Investors did not even believe that he owed them.

(Doc. 110 at 16–17).

Plaintiffs specify no disputed issues of material fact and the court finds none. Plaintiffs also cite no legal authority to support their claim that the aforesaid facts, viewed in the light most favorable to plaintiffs, constitute malice. It does not seem unreasonable to expect plaintiffs' counsel, who must prove malice, to favor the court with some law on the issue.

█ If this case was presented to a jury, the court would give an instruction on malice. PIK 2d 3.04 defines malice as "a state of mind characterized by an intent to do a harmful act without reasonable justification or excuse." *Nelson v. Miller* states that malice exists when a proceeding is initiated or continued primarily for a purpose other than to secure the proper adjudication of the claim on which it is based. 227 Kan. at 278, 607 P.2d 438. The case cites illustrations from § 676, comment c, of the Restatement (Second) of Torts:

whether any or all of the claims asserted in Investors' name in the various other proceedings would have been made.

---

9. There is nothing in the record to indicate what kind of action would have been asserted against the estate or, if such an action had been brought,

1. The person who brings the claim is aware that his claim is not meritorious.

2. The proceeding is begun primarily because of hostility or ill will.

3. The proceeding is initiated solely for the purpose of depriving a person of the beneficial use of his property.

4. The proceeding is initiated for the purpose of forcing a settlement that has no relation to the merits of the claim; in other words, a nuisance suit.

5. A counter claim is filed for the sole purpose of delaying expeditious treatment of the original cause of action.

*See id.* at 278–79.

Plaintiffs have made no effort to show how St. Paul's actions meet the *Nelson v. Miller* test or fit within any of the aforesaid illustrations and the court can divine none from the facts. While plaintiffs suggest there was something improper because St. Paul did not immediately pay Investors' loss and that Larson and Batt made claims in Investors' name without its specific authorization, they cite no authority that there was anything *legally* improper about these actions, much less that they were motivated by malice as defined in PIK 2d 3.04. They do not proffer evidence that St. Paul was aware that its claim lacked merit. There is no evidence of ill will or intent to delay. The cross-petition cannot be characterized as a "nuisance suit."

The court concludes that plaintiffs have failed to identify any disputed issues of material fact on the element of malice and have failed to show that St. Paul acted with malice. St. Paul is entitled to judgment as a matter of law.

*Favorable Termination of the Proceeding*

■ Plaintiffs also must prove that the underlying proceeding was terminated in their favor. St. Paul's position on this issue is clearly set forth in its motion (Doc. 100 at 20–22) and will not be detailed here. Basically, St. Paul argues that the Pawnee County District Court's ruling in the Federal Land Bank case that Investors' fraud claim was barred by the statute of limitations, and the Kansas Court of Appeal's affirmance of that ruling, did not constitute a termination of the fraud issue in favor of Dean Smith. St. Paul correctly notes that Kansas has not spoken on this issue, but cites decisions from other jurisdictions which support its position that dismissal of a claim because of a statute of limitations bar is not a favorable termination for purposes of a malicious prosecution case. This issue, of course, presents only a question of law.

Plaintiffs' complete response is as follows:

There was a favorable termination. St. Paul agreed that should the Court of Appeals sustain the state court's determination then Dean Smith would not owe any money on the claims of Investors allegedly assigned to St. Paul. (SOF # 30). St. Paul chose to voluntarily terminate all of its remaining causes of action if the Court of Appeals affirmed the state court decision. The appeal was affirmed on February 4, 1994. The termination of the appeal resulted in a favorable outcome for Dean Smith and meets the criteria set forth in *Nelson v. Miller,* 227 Kan. 271, 606 [607] P.2d 438 (1980). It is therefore not necessary to adopt the California court's rationale concerning dismissal based upon the statute of limitation defense.

(Doc. 110 at 17).

The court has reviewed *Nelson v. Miller* in an effort to find the "criteria" which would bring this case within its ruling. The case states:

Civil proceedings may be terminated in favor of the person against whom they are brought by (1) the favorable adjudication of the claim by a competent tribunal, or (2) the withdrawal of the proceedings by the person bringing them, or (3) the dismissal of the proceedings because of his failure to prosecute them. A favorable adjudication may be by a judgment rendered by a court after trial, or upon demurrer or its equivalent.

227 Kan. at 280, 607 P.2d 438.

No "competent tribunal" has ever determined that plaintiff did not commit fraud. None of the claims pursued by Larson in the various actions were ever dismissed for failure to prosecute. The "agreement" referred to by plaintiffs was part of the Order of

Confirmation of plaintiffs' Chapter 12 plan of reorganization (Doc. 100 at Ex. Y; Docs. 100, 110, Uncontroverted Fact at ¶ 30). The agreement stated:

> In consideration of this agreement, the debtors have agreed first, that should St. Paul Fire & Marine be ultimately successful and receive a final non-appealable judgment against Dean Smith, that said judgment will be paid outside the debtors' Chapter 12 Plan by Dexter Dean Smith in full; and, second, the debtors shall consent to St. Paul Fire & Marine's motion for stay relief to enable the debtors and St. Paul Fire & Marine to litigate any and all legal actions they may have against each other in the District Court of Pawnee County, Kansas. All claims the debtors may have against St. Paul Fire & Marine shall survive the debtors' Chapter 12 Plan of Reorganization.

(Doc. 100, Ex. Y at 3).

The court concludes, as a matter of law, that this agreement does not constitute a "withdrawal" of the fraud claim within the contemplation of *Nelson v. Miller*. The court further concludes that the Kansas Supreme Court would agree with the rationale discussed by the court in *Lackner v. LaCroix*, 25 Cal.3d 747, 602 P.2d 393, 159 Cal. Rptr. 693 (1979), and the other cases set out in St. Paul's memorandum (Doc. 100 at 20–22). Accordingly, the court finds that plaintiffs cannot satisfy the element of favorable termination and that St. Paul is entitled to judgment as a matter of law.

### *Reliance Based on Advice of Counsel*

■ In view of the previous conclusions that plaintiffs cannot meet their burden of proof on three essential elements of their malicious prosecution claim, it is legally unnecessary to discuss St. Paul's contention that it acted in reliance on counsel's advice. Nevertheless, the issue has been briefed so the court will discuss it.

■ Reliance on counsel is in the nature of an affirmative defense which serves to rebut the allegation of lack of probable cause. PIK 2d 14.33 provides:

> The advice of an attorney as to the institution of a civil action, sought and acted upon in good faith, is a complete defense for malicious prosecution, but this is so only when all of the facts known to the defendant have been fully and truthfully given to such attorney.

■ In the event of a trial, St. Paul would have to prove the following elements in order to establish probable cause for its actions based upon advice of counsel: (1) St. Paul believed it had good cause for its suit and did not seek Larson's advice to shelter itself, (2) St. Paul made a full and honest disclosure of all the material facts within its knowledge and belief, (3) St. Paul was uncertain of its legal rights, (4) St. Paul had reason to believe Larson was capable of giving competent advice about the case, and (5) St. Paul honestly pursued Larson's advice. *Hunt v. Dresie*, 241 Kan. 647, 659, 740 P.2d 1046 (1987).

St. Paul has set forth a number of facts which it claims are undisputed (Doc. 100 at 16–19). Plaintiffs have not made an effort to dispute or even discuss the facts directly but rather have responded as follows:

> St. Paul decided to take control of the civil proceedings involving Investors and Dean Smith. This action was approved on October 9, 1986 the day before St. Paul wrote a letter to B.G. Larson seeking his employment. St. Paul was clearly aware on October 9, 1986 and was informed by its own insured Rae Batt that Mr. Batt had committed legal malpractice in his title opinion to Investors. It appears that St. Paul sought counsel in order to some how [sic] obtain relief from having to pay Investors.

> The problem with St. Paul's defense is that St. Paul did not file the claim against Dean Smith for fraud and misrepresentation. The claims as originally filed were in the name of Investors. However, Investors neither approved nor believed such causes of action existed. At the time B.G. Larson filed the claims against Dean Smith he allegedly represented two different clients. One was Investors and the other was St. Paul. However, B.G. Larson testified his client was St. Paul. It appears

B.G. Larson filed these claims without the authority or approval of Investors on behalf of St. Paul and in direct conflict with Investors [sic] belief as to who the responsible party was, i.e. Rae Batt and his insurance company St. Paul. Whether or not the advice rendered by any of St. Paul's counsel is a sufficient enough defense is a question for the jury. *Hunt, supra.*

(Doc. 110 at 15–16).

Once again, the court expresses its disapproval of plaintiffs' counsel's failure to make the effort to apply clear, readily available Kansas law to the facts of the case. Whether St. Paul's counsel's advice "is a sufficient enough defense" is not an accurate summary of the elements set out in *Hunt v. Dresie.* The following is the court's own application of *Hunt v. Dresie* to plaintiffs' arguments:

1. *Good cause.*[10] At several places in their response, plaintiffs have claimed that beginning on October 9, 1986, St. Paul "took control" of the proceedings involving plaintiff. Plaintiffs seem to want to convey the impression that there was something wrong, sinister or malicious about the way Vogt handled the file. For example, plaintiffs point to language in Vogt's October 9, 1986 file entry which stated St. Paul's intention was to "[t]ake over defense of lawsuit to establish control as our insured's error is basis of suit" (Doc. 110, Vogt Dep. at Ex. 4). Vogt made this entry a day before he turned the file over to Larson and asked him to review the situation and take appropriate action. There is no evidence that St. Paul controlled its counsel or pressured Larson to file the fraud claim against plaintiff, or attempted somehow to "take over" the lawsuit in the sense of wresting control from its attorney.

Furthermore, as previously noted, plaintiffs' claim is based upon actions initiated in February 1987 when the cross-claim was filed in the Federal Land Bank case, not upon what occurred in October 1986. When plaintiffs filed bankruptcy, St. Paul relied upon Larson and Batt to obtain counsel for

Investors in that proceeding. The bankruptcy attorney they hired, Engel, advised filing an objection to plaintiffs' proposed plan, albeit not on the basis of fraud. Although Larson sent St. Paul a copy of Engel's letter which stated Engel's opinion that there was no evidence of plaintiff's intention to defraud Investors, Larson did not recommend to St. Paul that the fraud claim in the foreclosure action be withdrawn. St. Paul was aware that three attorneys, Larson, Batt and Keenan, believed there were grounds for a fraud claim against plaintiff. St. Paul appealed the dismissal of Investors' fraud claim based upon Larson's recommendation that an appeal had a good chance of being successful.

Finally, while all of the actions of St. Paul's counsel were intended to minimize St. Paul's exposure through reducing Investors' loss, this is not evidence that St. Paul sought counsel's advice merely to shield itself. No claim was being made against St. Paul. Rather, one of St. Paul's insureds had committed an act which triggered its obligation to provide coverage. Plaintiffs have presented nothing to show that St. Paul's counsel's subsequent actions designed to minimize St. Paul's ultimate exposure were either factually or legally improper.

2. *Full and honest disclosure.* Plaintiffs have not cited any fact which was known to St. Paul which it did not convey to the lawyers. Plaintiffs seem to suggest that Larson's lack of knowledge of the unrecorded 1983 power of attorney somehow bears on this factor (Doc. 110 at 15) but they fail to recognize that the standard which requires an attorney to investigate his or her client's claim pertains to cases where the *attorney,* not the client, is sued for malicious prosecution. *Nelson v. Miller,* 227 Kan. at 282–84, 607 P.2d 438.[11]

The same rationale applies to the dispute about whether attorney Burnett told Larson and Batt that Smith knew he had no authority to mortgage his mother's land under the 1984 power of attorney. Larson and Batt say he did; Burnett says he didn't. The

---

10. The court's findings and conclusions regarding St. Paul's probable cause are incorporated by reference.

11. Plaintiffs have sued Larson, Batt and Engel in the District Court of Shawnee County, Case No. 95 CV 129 (Doc. 113 at 14, n. 6).

point is: that information, correct or incorrect, came from the lawyers *to* St. Paul, *not from* St. Paul to the lawyers. While this dispute is genuine, it is not material because it does not affect the outcome of the case as assessed from controlling substantive law. *Rosile v. Aetna Life Ins. Co.,* 777 F.Supp. 862, 868 (D.Kan.1991), *aff'd,* 972 F.2d 357 (10th Cir.1992).

The court concludes that there are no disputed material facts concerning St. Paul's disclosure of information.

3. *Uncertainty about legal rights.* Plaintiffs' theme on this issue appears to be as follows: St. Paul was not uncertain about its obligation to pay Batt's claim; it knew that Batt had erred and therefore should have simply paid the claim and let some other party worry about whether and from whom the loss could be recovered. This argument ignores the facts. St. Paul clearly was uncertain about whether and how it could reduce its exposure by reducing Investors' loss. It is for this reason that it retained Larson.

The court concludes that there are no disputed issues of fact concerning whether St. Paul was uncertain of its legal rights.

4. *Capable counsel.* Plaintiffs have presented no evidence that Larson and Engel were not capable lawyers. Larson has been licensed in the State of Kansas since 1951 and has represented St. Paul for more than 20 years (Doc. 100, Uncontroverted Fact at ¶ 12). There was no reason for St. Paul to doubt that Larson was capable of giving competent advice or of retaining a capable bankruptcy attorney, Engel, to represent its interests in the bankruptcy proceedings. Batt's misreading of the 1984 power of attorney is not evidence of his lack of capability in other matters and, in any event, he did not make the calls about which plaintiffs complain.

5. *Honest pursuit of advice.* Plaintiffs have pointed to no facts which would support a finding that St. Paul did not honestly pursue its counsels' advice. Larson advised St. Paul to file the cross-claim in the Federal Land Bank case; Engel advised St. Paul to file an objection to plaintiffs' proposed plan in bankruptcy; Larson advised St. Paul to

appeal the dismissal of the fraud claim. There is no evidence that St. Paul did not honestly pursue the advice it received from its counsel.

The court concludes plaintiffs have offered no facts to dispute St. Paul's evidence that it reasonably relied upon the advice of its counsel.

### Conclusion on Malicious Prosecution Claim

In conclusion, the court finds that no jury issues exist on the claims of malicious prosecution. The court accordingly grants St. Paul's motion for summary judgment on plaintiffs' malicious prosecution claim.

### Other Claims

Plaintiffs claim of abuse of process, tort of outrage, intentional infliction of emotional distress and interference with business relations. In light of the undisputed evidence discussed above, plaintiffs' claims are factually and legally meritless.

The court finds that plaintiffs have completely failed to make a showing of outrageous conduct needed to support their claims of outrage and emotional distress. *See Fusaro v. First Family Mortgage Corp.,* 257 Kan. 794, 805, 897 P.2d 123 (1995) (court must make threshold determination of whether conduct is so atrocious and utterly intolerable as to be "outrageous").

Plaintiffs also have not offered evidence that St. Paul made improper use of process or that it had an ulterior motive during the foreclosure case or bankruptcy proceedings. *Wellsville Bank v. Sutterby,* 12 Kan.App.2d 585, 589, 752 P.2d 700 (1988). "In abuse of process it is said the gist of the tort is not commencing an action or causing process to issue without justification, but misusing or misapplying process, justified in itself, for an end other than that which it was designed to accomplish." *Jackson & Scherer, Inc. v. Washburn,* 209 Kan. 321, 331, 496 P.2d 1358 (1972). Plaintiffs do not even proffer a possible ulterior motive of St. Paul's, and any attempt to do so in light of the evidence could only be described as visionary. This applies as well to plaintiffs' last

claim, tortious interference with business, which is predicated upon intentional misconduct by the defendant. *Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 168–69, 872 P.2d 252 (1994); *Macke Laundry Serv. v. Mission Associates,* 19 Kan.App.2d 553, 564, 873 P.2d 219 (1994).

The court accordingly grants St. Paul's motion for summary judgment on plaintiffs' remaining claims of outrage, intentional infliction of emotional distress, abuse of process and interference with business relations. Count III, plaintiffs' claim for punitive damages, is moot.

### Statute of Limitation Defenses

St. Paul moves for summary judgment on plaintiffs' claims of tortious interference with business relations, tort of outrage, and intentional infliction of emotional distress on the grounds that they are barred by Kan.Stat. Ann. § 60–513 (Doc. 100 at 12–13).

In view of the court's rulings on the merits of plaintiffs' claims, the court finds it unnecessary to decide the validity of St. Paul's defense based on the statute of limitations.

### Plaintiffs' Motion for Summary Judgment

Plaintiffs have moved for summary judgment on all of St. Paul's counterclaims. Because St. Paul asserts it claims only by way of set-off and the court has granted summary judgment against plaintiffs on all plaintiffs' claims, plaintiffs' motion for summary judgment is moot.

IT IS ACCORDINGLY ORDERED that St. Paul's motion for summary judgment (Doc. 99) is GRANTED. Plaintiffs' motion for summary judgment (Doc. 98) is moot. The clerk is directed to enter judgment for St. Paul and to tax costs to plaintiffs.