2003 SD 108

**Thomas J. YARCHESKI, Plaintiff and Appellant,**

v.

**Kevin REINER, Celia Miner, and Johnson, Heidepreim, Miner, Marlow & Janklow, LLP, Defendants and Appellees.**

No. 22617.

Supreme Court of South Dakota.

Considered on Briefs April 24, 2003.

Decided Sept. 3, 2003.

Rehearing Denied Oct. 21, 2003.

Thomas J. Yarcheski, pro se, Naples, Maine, for plaintiff and appellant.

Thomas J. Welk of Boyce, Greenfield, Pashby & Welk, Sioux Falls, South Dakota, Attorneys for defendants and appellees.

KONENKAMP, Justice.

[¶ 1.] Following his unsuccessful challenge to the procedure by which his university tenure-track contract was not renewed, plaintiff appealed in circuit court. His appeal was dismissed, however, when his attorneys submitted an untimely brief. He then brought a legal malpractice suit against his attorneys. In granting summary judgment for the attorneys, the circuit court ruled that plaintiff would not have prevailed in his administrative appeal even if his brief had been timely filed. An essential element in appellate legal malpractice is proof that the client would have prevailed but for the error of counsel. Because we agree with the circuit court that the appeal would not have been successful had it been properly pursued, we affirm.

## I.

[¶ 2.] Plaintiff, Thomas J. Yarcheski, Ph.D., was a first-year tenure track faculty member employed at the University of South Dakota during the 1991–92 school year. He served as an Associate Professor, teaching Health Services Administration at the School of Business. Early in his first semester, several students came to Associate Dean Robert W. Reinke with complaints about Yarcheski's teaching. These ranged from criticism of his arrogance in the classroom to dissatisfaction with his disorganized teaching style. Yarcheski later acknowledged that his teaching style differed from what many students expected. It was his object to pursue greater academic standards than those sought by his colleagues on the fac-

ulty.[1] To this end, he required more student interaction, avoided lecturing directly from the text, and chose not to design his lectures simply to provide an outline of material.

[¶ 3.] As a result of the complaints, Reinke and the Director of the Department of Health Services Administration, Professor Michael J. Myers, met with Yarcheski informally several times to make suggestions on how he might improve the organization and presentation of his course material. Yarcheski was not altogether responsive to these suggestions. For instance, he reacted inappropriately to the suggestion that he refer to the textbook during his lectures. He returned to his class and read the text to the students—"If you want to be involved with the text, I'll get you involved in the text."

[¶ 4.] Reinke and Myers also suggested to Yarcheski that they attend his classes and that a student committee be created to expedite student feedback. Yarcheski declined both suggestions. He said that their attending his classes would undermine his credibility. He told them, "I [want to] solve the problem myself." As to the student committee idea, Yarcheski thought that it would violate his academic freedom. Although they had the authority to override his requests, Myers and Reinke acquiesced. "Hang in there," Yarcheski told them, "I'll turn this around; I've been down this road before."

[¶ 5.] As an alternative, Yarcheski suggested that in addition to the student evaluation forms used by the university that "Harvard" evaluation forms be distributed. Harvard evaluations are open-ended invitations to students to evaluate their learning experience. After reviewing the Harvard evaluations completed at the end of the fall semester, Myers sent Yarcheski a memorandum dated January 20, 1992, outlining steps to be taken in the next nine days. The steps included attendance by Myers and Reinke in Yarcheski's classes, their review of student research papers and examinations, a self-assessment and corrective action plan to be prepared by Yarcheski, and a redistribution of the Harvard evaluation forms. Myers explained the reason for these measures:

> The issue of contract renewal, as you can appreciate, has arisen in the wake of the widespread student criticism of your teaching technique and presentation. That criticism was generally affirmed in the "Harvard" evaluations submitted by the students in your Long–Term Care and Systems courses, offset [by] a minority view that was favorable.

The memorandum explained that the university's internal deadline for recommending contract renewal was January 31. These steps, Myers wrote, "will allow us to substantiate a rationale for contract renewal, or if we are unable to obtain a more favorable assessment, provide a fair and objective basis for nonrenewal."[2]

---

1. His previous position was Associate Professor and Program Director at St. Joseph's College in Maine. Although Yarcheski quotes the President of St. Joseph's in rating his teaching performance as "masterful," his contract there was also not renewed because of his teaching performance. He filed a grievance claiming that the college did not follow proper procedures for nonrenewal. His grievance was unsuccessful, as was his subsequent lawsuit.

2. In the fall semester, Reinke explained to Yarcheski that the assessment "criteria we use is thoroughly described in the faculty handbook under teaching, research, and service." The handbook categorizes performance as excellent, satisfactory, or unsatisfactory, and provides descriptions. Reinke and Myers told Yarcheski that their assessment of his performance was directly related to "the competencies described in the faculty handbook in regards to teaching."

[¶ 6.] Parts of this plan were never completed. Yarcheski gave Myers two grocery bags containing student work product, but Myers deemed this material irrelevant because it "would not permit a basis for meaningful comparative assessment of teaching performance." Myers had previously seen copies of student papers with Yarcheski's commentary and "markup," and on at least one prior occasion, he reviewed a draft copy of one of Yarcheski's exams. Both Reinke and Myers attended one of Yarcheski's classes. Although neither reduced their findings to writing, they informed Yarcheski directly of their observations. Myers told him on January 24 that his class presentation was "fairly rambling" and that it was not "a particularly well-taught class." Reinke told him that the class he observed was "in general, poorly conducted." Reinke also told Myers that he "was not satisfied with the style and the content of the class." Myers passed this on to Yarcheski. In response, Yarcheski sent Reinke a memorandum documenting their communication on these observations.[3]

[¶ 7.] In a letter dated January 31, 1992, Myers recommended to the Dean and Associate Dean that Yarcheski's contract not be renewed. In turn, the Dean sent a memorandum to the Vice President of Academic Affairs:

Consistent with the guidelines set forth in the BOR/COHE Agreement Division II, Section 1.7, I am recommending that [Dr.] Thomas Yarcheski, Health Services Administration, ... be notified that [he] will not be offered a faculty contract FY 93.

**3.** When later questioned in the grievance hearing, Reinke said that he thought Yarcheski was warm and caring with the students as individuals, but his deficiencies were in the classroom. According to Reinke, Yarcheski

Dr. Yarcheski began his work with us FY 92 on a tenure track contract and has been unable to provide the Health Services program with the level of teaching performance necessary to maintain HSAD's quality reputation. After numerous meetings with related supervisors/administrators, classroom observations, and substantial student input, I am not convinced that Dr. Yarcheski is willing or perhaps able to change his teaching behavior enough to meet the standards of our program.

[¶ 8.] On February 20, 1992, Myers gave Yarcheski his Professional Staff Evaluation, as required by the Agreement between the South Dakota Board of Regents and the Council of Higher Education (BOR/COHE). In this evaluation instrument, Myers rated Yarcheski unsatisfactory in teaching. The accompanying comment stated, "[s]tudent evaluations indicated students did not learn relevant material. Indicated assignments were not helpful, and there was a lack of systematic presentations." Yarcheski was also rated unsatisfactory in research but excellent in service.

[¶ 9.] In a letter dated February 19, 1992, Yarcheski was given written notice of his opportunity to meet with Myers on February 27, 1992, before the issuance of a notice of nonrenewal. This meeting was held as scheduled. Finally, on February 29, 1992, University President Betty Turner Asher informed Yarcheski by letter that his contract would not be renewed for the 1992–93 academic year. The letter explained, "[t]he reason for this action is inadequate teaching."

"would be an excellent graduate-level instructor," having a "great mind," but he was not "communicating well," was not "instructing his undergraduate students well."

[¶ 10.] Yarcheski filed three grievances. The first was before the notice of nonrenewal, requesting abrogation of the recommendations of nonrenewal and formal participation in the process of professional evaluation. The second was on the performance evaluation. The third was in response to his notice of nonrenewal. The grist of his complaints was that his nonrenewal resulted solely from student evaluations. As he would later explain, "the evaluation of teaching performance belongs to the professoriat; we have a duty to evaluate each other; I don't believe it's the duty of students to evaluate the professoriat." The grievances were denied.

[¶ 11.] Yarcheski hired attorney Celia Miner of the Johnson, Heidepreim, Miner, Marlow & Janklow law firm. Kevin Reiner, an associate in the firm, assisted her. They pursued an appeal to the South Dakota Board of Regents and the Department of Labor. Both ruled against Yarcheski, concluding that the proper nonrenewal procedures were followed.

[¶ 12.] Yarcheski then directed his attorneys to appeal the Department of Labor's decision to the circuit court.[4] A Notice of Appeal was filed on March 10, 1994. Although Reiner left the law firm in 1994, he assisted in preparing an opening brief, which was submitted on April 13, 1995. On the motion of the South Dakota Board of Regents, the circuit court dismissed the appeal because the brief had not been timely filed. Yarcheski appealed to this Court, and we summarily affirmed.

[¶ 13.] Yarcheski then brought this legal malpractice action against Reiner, Miner, and their law firm. Following the withdrawal of his new attorney, Yarcheski decided to represent himself. Both sides moved for summary judgment. The circuit court ruled that Yarcheski would not have prevailed on his administrative appeal, and thus his legal malpractice claim was deficient as a matter of law. The court granted summary judgment to the defendant attorneys. On appeal to this Court, Yarcheski presents the following issues: (1) "Did [the defendant attorneys] commit legal malpractice when they missed a filing deadline in the Sixth Judicial Court in 1995 resulting in the [plaintiff's] case being dismissed." (2) "Would the plaintiff have prevailed, upon appeal, in his original grievance against the University of South Dakota?"

## II.

[¶ 14.] Evaluating academic performance is a venture beyond our expertise and our jurisdiction. In reviewing decisions concerning academic performance, our role is limited to inspecting the contract and examining the administrative proceedings to learn whether the evidence supported the determination. SDCL 1–26–37. We examine a contract as a whole, giving meaning, if possible, to all its provisions. *Enchanted World Doll Museum v. Buskohl,* 398 N.W.2d 149, 151–52 (S.D. 1986). Fundamental to maintaining academic excellence, faculty evaluations retain a singular importance in educational institutions. Universities have a vital interest in retaining and promoting only the best faculty members. Conversely, faculty members have an equally vital interest in receiving fair evaluations. *See generally Ford v. Nicks,* 741 F.2d 858, 864 (6thCir.1984); *Lieberman v. Gant,* 630 F.2d 60, 67 (2nd Cir.1980) (courts should not sit as "Super–Tenure Review Committees").

---

4. Although Yarcheski wanted to proceed with this appeal, he had not been paying the law firm's bills. Instead, he declared bankruptcy. Nonetheless, his attorneys continued to represent him in the circuit court appeal.

■ [¶ 15.] In this case, the circuit court granted a summary judgment. Our standard for reviewing summary judgments has been recited in numerous cases and need not be repeated in detail here. *See Kobbeman v. Oleson,* 1998 SD 20, ¶ 4, 574 N.W.2d 633, 635. In accord with this standard, we view the facts in a light most favorable to Yarcheski as the opposing party. The burden remains on the defendant attorneys to prove the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *State Dep't of Revenue v. Thiewes,* 448 N.W.2d 1, 2 (S.D.1989).

## III.

■ [¶ 16.] This legal malpractice action originates from the failure to timely file a brief in Yarcheski's appeal. Because the brief was filed late, the appeal was lost. However, that result, by itself, does not mean that Yarcheski wins his suit. To prevail in his legal malpractice action, Yarcheski must first prove the four basic elements of negligence: (1) an attorney-client relationship giving rise to a duty; (2) the attorneys, either by an act or a failure to act, violated or breached that duty; (3) the attorneys' breach of duty proximately caused injury to the client; and (4) actual injury, loss, or damage. *Keegan v. First Bank of Sioux Falls,* 519 N.W.2d 607, 611 (S.D.1994) (citation omitted). On the element of proximate cause, Yarcheski must prove that the underlying claim was valid and would have resulted in a favorable and collectible judgment had it not been for the attorneys' error.[5] *Haberer v. Rice,* 511 N.W.2d 279, 284–85 (S.D.1994). Thus, Yarcheski must prove two distinct cases in a single proceeding.

[¶ 17.] As did the trial court, we probe one element necessary in an appellate legal malpractice claim, i.e., proof that the client would have prevailed in the appeal. That element behooves us to touch on an issue of first impression in South Dakota: is the question whether the appeal would have been successful a question for the court or the jury? *Haberer* addressed methods by which a legal malpractice claim can be submitted to a jury. *Id.* at 285. This case is different, however, because the action giving rise to the malpractice claim was an administrative appeal. *See* SDCL Ch 1–26. Administrative appeals, like all appeals, are not decided by juries. SDCL 1–26–30.2 provides that "[a]n appeal shall be allowed in the circuit court to any party in a contested case from a final decision, ruling or action of an agency." And "[t]he review shall be conducted by the court without a jury and shall be confined to the record." SDCL 1–26–35.

■ [¶ 18.] In examining this question, the Supreme Court of Michigan ruled that whether an appeal would have succeeded if it had been properly pursued is an "issue for the court because the resolution of the underlying appeal originally would have rested on a decision of law." *Charles Reinhart Co. v. Winiemko,* 444 Mich. 579, 513 N.W.2d 773, 777 (1994). The *Reinhart* court adopted the reasoning of the Texas Supreme Court in *Millhouse v. Wiesenthal,* 775 S.W.2d 626, 628 (Tex.1989):

> The question of whether an appeal would have been successful depends on an analysis of the law and the procedural rules. [The plaintiff's] petition that

---

**5.** In an action for appellate legal malpractice the plaintiff must prove two aspects of causation: whether the attorney's negligence caused the loss or unfavorable result of the appeal, and whether the loss or unfavorable

result of the appeal in turn caused a loss or unfavorable result in the underlying litigation. 2 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 24.39, (3dEd 1989).

the jury should make this determination as a question of fact would require the jury to sit as appellate judges, review the trial record and briefs, and decide whether the trial court committed reversible error. A judge is clearly in a better position to make this determination. Resolving legal issues on appeal is an area exclusively within the province of judges. . . .

We find this rationale persuasive and conclude that in an appellate malpractice action the question whether the appeal would have been successful if it had been properly pursued is a legal matter to be resolved by the court.

## IV.

■ [¶ 19.] Although his attorneys filed an untimely brief, Yarcheski does not contend that its content was deficient. Indeed, he makes essentially the same arguments in this appeal that his attorneys made for him in the aborted circuit court appeal. The essence of his claim is that the evaluation and nonrenewal processes are contractually sequenced so that the decision not to renew must follow only from an adequate written evaluation in compliance with the BOR/COHE agreement.

[¶ 20.] Division II, 2.1 of the BOR/COHE contract, entitled "Performance Evaluation Guidelines," provides that "all faculty unit members will be evaluated annually." Yarcheski was a "faculty unit member" under Division I, 1.7. The performance evaluation must be in "written form," as required by Division II, 2.1(2). Division II, 2.2(3) states: "Included in the evaluation must be comments about the faculty unit member's performance in each of the areas of teaching, research and scholarship, and service." Under Division II, 2.2(5), one of the purposes of the written evaluation is to allow the vice president or dean to review it and "make appropriate comments to the president about contract renewal. . . ." In Division II, 2.3, the contract states that "Student opinion surveys will be used as part of the evaluation of faculty unit members, along with other procedures set forth in this article." However, per Division II, 2.3(3), "Student opinion surveys will not be used as the controlling criterion for personnel actions."

[¶ 21.] A written evaluation was given to Yarcheski by his immediate administrative supervisor on February 20, 1992. By the terms of Division II, 2.2, evaluations must be completed "[p]rior to the last day of February," and under Division II, 1.7, notices of nonrenewal must be given before March 1. Obviously, February 19 is "prior to the last day of February," thus it appears that the evaluation was completed in a timely manner. Although the evaluation was timely, Division II, 2.2(3) further states that "[o]bservations may include, but do not require, classroom observations, unless there is good cause to suspect serious deficiencies in performance." Yarcheski's evaluation required classroom observation because the administration had suspected "serious deficiencies in performance."

■ [¶ 22.] Yarcheski argues that his written evaluation was deficient in failing to state any criteria other than student evaluations. It simply states: "Teaching—Student evaluations indicated students did not learn relevant material, indicated assignments were not helpful, and there was a lack of systematic presentations. Rating—Unsatisfactory." While student opinion surveys may not be the determinative factor in "personnel actions," an evaluation itself is not a personnel action. According to Division I, VII, 7.1(4), a personnel action includes "discipline, contract renewal, salary and pay matters, tenure, and promotion."

[¶ 23.] Despite Yarcheski's objections to the form of his written evaluation, the record contains ample evidence that he was fully evaluated in his job performance through his many meetings with Myers and Reinke. Although the evaluation has no notations documenting classroom observation, both Myers and Reinke did in fact observe Yarcheski in class.[6] Because the academic evaluation process is partly subjective and thus less susceptible to precise judicial review, courts have held that the nonrenewal process need not be perfect: substantial compliance is all that is required. As the North Dakota Supreme Court observed in *Stensrud v. Mayville State College*, 368 N.W.2d 519, 522 (N.D. 1985), "Generally, substantial compliance with the procedural requirements for termination is sufficient if their purpose is fulfilled." Likewise, in *Piacitelli v. Southern Utah State College*, 636 P.2d 1063, 1067 (Utah 1981), the Utah Supreme Court concluded:

> While exact conformance with the precise terms of the termination procedures is doubtless the least controversial course, so long as the substantial interests those procedures are designed to safeguard are in fact satisfied and protected, failure to conform to every technical detail of the termination procedure is not actionable.

We apply the same standard in South Dakota. We will not override the university's judgment when contract procedures were substantially complied with and the interests of the parties were satisfied. *Beville v. University of South Dakota*, 420 N.W.2d 9, 14 (S.D.1988). Consequently, assuming for the sake of argument that the form of the evaluation was a violation of the BOR/COHE agreement, the evaluation proce-dures were nonetheless substantially fulfilled.

## V.

[¶ 24.] We come now to the heart of this case. The controlling question here is not whether the annual performance evaluation was fully completed in accord with the BOR/COHE contract, but whether such written evaluation was a condition precedent to nonrenewal. Our answer must come from the contract. The rights and obligations of parties to a contract are determined solely by the contract language, which must be construed according to the plain meaning of its terms. *Biegler v. American Family Mut. Ins. Co.*, 2001 SD 13, ¶ 20, 621 N.W.2d 592, 598–99. Contract interpretation is a question of law. *State Farm Mut. Auto. Ins. Co. v. Vostad*, 520 N.W.2d 273, 275 (S.D.1994).

[¶ 25.] In Division II, 1.7, entitled "Nonrenewal of Tenure Track Contracts," the pertinent language states:

> Prior to the issuance of a written notice of nonrenewal, the faculty unit member's immediate supervisor will provide the opportunity for a meeting with the faculty unit member to apprise the faculty unit member of the proposed action. The faculty unit member will be given at least five (5) working days written notice of such meeting so that both the faculty unit member and the immediate supervisor may arrange to have present a witness or a representative.
>
> In order to facilitate the relocation of faculty unit members who are not to be rehired, *the administration agrees to provide notice of its intent not to rehire any faculty unit members serving under a tenure track contract. The notice will state the reasons for the decision*

---

6. Myers later testified that on hindsight he "would have made it clear [in the written evaluation] that the conclusion with regard to his teaching performance was strongly influenced by, but not controlled by, student evaluation."

*and will be given in accordance with the following schedule:*

1. A faculty unit member who has completed less than one (1) academic year of service under a tenure track contract shall receive written notice of nonrenewal from the institution before March 1 of the current year of appointment.

\* \* \*

(Emphasis added.) The remaining, unquoted portions of this section provide for graduated protections to tenure track faculty members as their terms of service increase beyond one year. Yarcheski was a faculty unit member who had completed less than one academic year of service. No part of Division II, 1.7 mandates an evaluation before a nonrenewal decision. Nontenured faculty members are essentially year-to-year employees. The process for nonrenewal of such employees only requires (1) an opportunity to meet, on five day's notice, with the tenure track faculty member's immediate supervisor to be apprised of the proposed action, and (2) written notice stating the reasons for nonrenewal.

[¶ 26.] On February 19, 1992, before the issuance of a notice of nonrenewal, Yarcheski's supervisor, Myers, advised him of the proposed action and provided a meeting date of February 27, 1992. In accord with the requirement in Division II, 1.7(1) that notice be given before March 1 of the current year of appointment, Yarcheski had written notice of nonrenewal from the university on February 29, 1992. As required by the contract, the written notice further declared the reason for nonrenewal as "inadequate teaching." Thus, the university complied with Division II, 1.7.

[¶ 27.] Division I, 7.1(4), entitled "Evaluation—General Provisions," states that "[t]he purpose of the evaluation will be to:

. . . [p]rovide basic information for personnel decisions such as discipline, *contract renewal,* salary and pay matters, tenure, and promotion." (Emphasis added.) Further, Division II, 2.2(5) states: "The vice president/dean will review the completed evaluation and make appropriate comments to the president about contract renewal, . . ." Yarcheski contends that because one purpose of the evaluation is to provide information on contract renewal decisions, a properly completed faculty evaluation is a condition precedent to a valid nonrenewal decision.

[¶ 28.] Certainly, these provisions contemplate that the information in the evaluation will be used to make contract renewal decisions. But nothing in the evaluation and nonrenewal provisions indicates that the evaluation is the exclusive source of information for personnel decisions. Nor does any provision suggest that a written evaluation form in full compliance with the BOR/COHE contract is a prerequisite to a decision to nonrenew. In fact, the caption for Division I, 7.1 cross-references Division II, Article II and Division III, Article II, but does not cross-reference Division II, Article I containing the nonrenewal sections. We find no provision of the BOR/COHE contract that supports Yarcheski's premise that the criteria used in the decision not to renew must be set out in the performance evaluation as a prerequisite to a valid nonrenewal decision. Courts will not impose requirements in a contract that the parties themselves failed to include. *Raben v. Schlottman,* 77 S.D. 184, 190, 88 N.W.2d 205, 208 (1958). The ALJ and the circuit court were correct in finding that compliance with Division II, 2.1 through 2.3 is not a prerequisite to the nonrenewal procedure set forth in Division II, 1.7 of the BOR/COHE contract.

## VI.

[¶ 29.] Yarcheski's final assertion is that the university violated his academic freedom. As stated in Division I, 10.1 of the BOR/COHE contract, "subject to accepted standards of professional responsibility," academic freedom "is intended to guarantee those rights which are recognized as flowing from the First Amendment to the United States Constitution." The contract defines academic freedom to include "the right to study, discuss, investigate, teach and publish." More particularly, this section explains: "Faculty unit members are entitled to freedom in the discussion and presentation of their subject and are privileged to introduce various scholarly views."

[¶ 30.] Yarcheski believes that overreliance on student surveys infringed on his academic freedom. In his words,

The issue of academic freedom in this case involves students judging members of the academy. It involves students controlling the . destiny of faculty through their opinions and opinion surveys.... The administrators at the University of South Dakota, particularly at the School of Business, exercised no significant judgment with respect to the opinions of students concerning the teaching of faculty.

It is true that his written evaluation mentioned only student surveys. Nonetheless, after their personal observations of his classes, both Reinke and Myers concluded that his performance was unsatisfactory. Moreover, the action plan and the many conferences that they had with Yarcheski to improve his teaching cannot be understood as anything less than an expression by his superiors of serious concern with his teaching abilities.

[¶ 31.] In concluding that Yarcheski's "academic freedom was not infringed," the ALJ found that Myers and Reinke made no attempt to "foist upon Yarcheski certain methods of teaching or course content." Aside from whether this finding correctly frames the scope and measure of academic freedom as between professors and administrators, we can only note that Yarcheski cites no case authority to support his argument. We readily acknowledge, nonetheless, that academic freedom generally assures to educators freedom in their First Amendment pursuits from interference not only by administrators and other faculty, but by students as well. In any event, the circuit court ruled that "[a]fter a full review of the facts in this case, this court cannot find any evidence that either Yarcheski's supervisor or the associate dean infringed on his academic freedom in any manner."

[¶ 32.] University faculty members may establish an infringement of academic freedom if the decision not to rehire them was made because of their exercise of constitutionally protected First Amendment freedoms. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pickering v. Bd. of Educ.,* 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Untenured employees enjoy the same freedoms. *See Perry v. Sindermann,* 408 U.S. 593, 597–98, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). On the other hand, universities have an interest as employers "in promoting the efficiency of the public services" they perform through their faculty members. *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35, 20 L.Ed.2d at 817. Under the aegis of academic freedom, a university may "determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy v. New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring in result).

[¶ 33.] Education officials may decline to renew a contract for academic reasons unrelated to academic freedom, such as inadequacy in teaching or failure to obey legitimate administrative directives. *See Adams v. Campbell County School Dist.*, 511 F.2d 1242 (10th Cir. 1975); *Ahern v. Bd. of Educ. of School Dist. of Grand Island*, 456 F.2d 399 (8th Cir.1972); *Chung v. Park*, 514 F.2d 382 (3d Cir.), cert. denied, 423 U.S. 948, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975). In fact, a university may lawfully choose not to renew the contract of a nontenured professor whose pedagogical attitude and teaching methods fail to conform to institutional standards. *Hetrick v. Martin*, 480 F.2d 705, 708 (6th Cir.), cert. denied, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973). *Hetrick* dealt with the administration's dissatisfaction over a nontenured professor's teaching methods and ability. There, the Sixth Circuit Court of Appeals found that no First Amendment interests were implicated when a university decided not to renew the contract of a nontenured professor because of her teaching style and methods. *Id.* Numerous students had complained about "their inability to comprehend what she was attempting to teach them or what was expected of them." *Id.* at 706. The First Amendment guarantee of academic freedom does not require a university to tolerate any manner of teaching method a professor may choose to employ. *Id.* at 707.

[¶ 34.] Yarcheski never explains how his inadequate teaching style, as evaluated by the university as well as many of his students, fits under the protection of academic freedom. Nor does he submit any legal justification to prohibit student input on faculty performance. To maintain academic excellence, institutions of higher learning must ensure that their students have the benefit of the best education. The university's choice in using student surveys as part of its effort to fulfill that goal is not an infringement of academic freedom. Surely, educational institutions have the right to expect that their teachers will be able to teach.

[¶ 35.] For the foregoing reasons, we conclude that Yarcheski would not have prevailed in the appeal from his grievance against the University of South Dakota; therefore, his claim for legal malpractice fails for lack of proof of an essential element.

[¶ 36.] Affirmed.

[¶ 37.] GILBERTSON, Chief Justice, and SABERS and MEIERHENRY, Justices, and MILLER, Retired Justice, sitting by Order of the Court, concur.

[¶ 38.] MILLER, Retired Justice, sitting for ZINTER, Justice, disqualified.